No. 20,032.

J. E. WHITTEN, STATE ENGINEER OF COLORADO, ET AL., *v.*
LINCOLN D. COIT, EXECUTOR OF THE ESTATE OF
M. HUMPHRIES, DECEASED, J. LEWIS FORD, ET AL.

(385 P. [2d] 131)

Decided September 9, 1963.

158

Mr. DUKE W. DUNBAR, Attorney General, Mr. FRANK E. HICKEY, Deputy, Mr. JOHN B. BARNARD, JR., Special Assistant, for plaintiffs in error.

Mr. ALBIN ANDERSON, for defendant in error J. Lewis Ford.

Messrs. SMITH, HOLMES, WILLIAMS & TURNER, Messrs. TRAYLOR, ELA, KLADDER & HARSHMAN, Messrs. REAMS, UHRLAUB & CARTER, for certain of the defendants in error joining in the brief of the Attorney General.

*En Banc.*

MR. JUSTICE MOORE delivered the opinion of the Court.

THE controversy now presented for determination was before this court in an original proceeding entitled *Prinster, et al., v. District Court*, 137 Colo. 393, 325 P. (2d) 938. A majority of the court determined that the controlling question should not be decided in an original

proceeding and that the cause should proceed to final judgment to which a writ of error should be directed.

A statement of the facts pertinent to our present inquiry is set forth in *Prinster, et al., v. District Court,* supra, as follows:

"In 1948 the District Court of Mesa County entered its decree in a general water adjudication proceeding and granted decreed priorities to *eighteen claimants* for the use of water from an alleged aquifer for domestic purposes. That decree became final nearly ten years ago. No review thereof has ever been sought in the trial court or this court. On January 8, 1957, eight of the above mentioned claimants, who were decreed priorities in the 1948 adjudication proceedings, commenced an action in the District Court of Mesa County, Civil Action No. 10599, naming as defendants (1) twenty-eight persons or firms, none of whom had any decreed rights, but who it is alleged have wells and are taking water from the aforesaid aquifer; (2) ten of the above mentioned *eighteen claimants,* decreed owners of water, who refused to join as parties plaintiff and were therefore made parties defendant; (3) three water officials of the state of Colorado, and (4) all unknown persons who claim any interest in the subject matter of the action.

"The purpose of the action was to (1) obtain a mandatory injunction requiring the state engineer and his deputies to recognize and enforce the 1948 decree; (2) to enjoin those defendants who had no decreed rights from diverting water from the aquifer, and (3) to require the owners of all wells taking water from the aquifer to properly cement and equip them to the end that water not be wasted and lost.

"A motion to dismiss the action was filed in behalf of 'the defendants herein who are represented by their respective attorneys.' The record does not disclose who of several defendants joined in the motion.

"The reason assigned for dismissal is:

" 'That this Court has no jurisdiction of said supposed

cause of action set forth in the Complaint herein for the reason that the purported decree of this Court of August 23, 1948, * * * was null and void and without the powers of this Court *under the Constitution and Statutes of this State.*' (Emphasis supplied.)

"The attorney general, in behalf of the three state officials, filed a motion to dismiss and assigned as reason therefor: ' * * * the complaint does not state a claim against these defendants upon which relief may be granted.'

"On May 25, 1957, Judge Hughes denied defendants' motions and granted them twenty days to answer, and on October 7, 1957, denied the motion to dismiss filed in behalf of the state officials and at that time ordered all defendants to ' * * * answer within ten days from the receipt of this Order, *unless some Defendant desires to stand on Motion to Dismiss* and if so, a written statement to that effect be filed with the Court within said ten-day period.' (Emphasis supplied.)

"None of the defendants elected to stand on their motions to dismiss and none answered."

Thereafter certain of the defendants instituted the original proceedings hereinabove mentioned.

Following announcement of the opinion in *Prinster v. District Court,* supra, a joint answer was filed by twenty of the named defendants and a separate answer was filed on behalf of the W. F. McCoy Company.

The action was tried to the court and upon the evidence adduced, the trial court entered its Findings of Fact, Conclusions of Law, Judgment and Decree which includes, inter alia, the following:

"1. The underground waters are public and subject to private appropriation by putting to beneficial use, and the decree adjudicating priorities is valid."

The "decree adjudicating priorities" to which reference is made by the trial court is the decree entered in the 1948 adjudication proceedings, being Civil Action No. 10599 in the district court of Mesa County, Colo-

rado. By this 1948 decree, which purported to grant priorities to certain wells, the following determination of pertinent facts was made:

"The wells involved in this proceeding are bottomed in three separate and distinct sands: the upper sand is known as the Morrison Sand, the second sand down is known as the Entrada Sand and the bottom sand as the Wingate Sand. These sands have no connection with each other and are separated by an impervious structure so that no water seeps or percolates from one to the other. *The water contained in these sands is not tributary to any natural surface stream.* * * * " (Emphasis supplied.)

The trial court in the instant action adjudged, inter alia:

"1. That the decree entered in Civil Action No. 7327 in this Court on August 23, 1948, is valid and in full force and effect as a decree fixing priorities for the use of public waters in the Entrada, Morrison and Wingate sandstones underlying lands in Mesa County, Colorado.

"2. That defendants J. E. Whitten, State Engineer of Colorado; Frederick W. Paddock, Irrigation Division Engineer of Division No. 4; and Woodrow W. Saunders, Water Commissioner of Water District No. 42, are hereby ordered to control and administer said underground waters and wells in the same manner and to the same purpose as in the case of diversions from public streams of the State of Colorado. In particular, but without limitation thereto, they shall require persons owning or possessing such wells to do the following:

"(a) To install shutoff valves or devices to enable the flow to be cut off.

"(b) To case and cement each well or take such other action as is necessary to prevent the running of water from one formation to another.

"(c) To cease all waste of water from such wells after it reaches the surface.

"(d) To install a meter on each well to measure the quantity of water taken therefrom.

"(e) To allow the performance of such tests or measurements as may be required to determine from time to time the hydrostatic head or other facts concerning such well; and said officials shall make and maintain records of the date obtained by them regarding each such well."

In addition to the above quoted order on the state officers, the trial court enjoined numerous other defendants from, "Taking water from any well or allowing the same to flow from such well when such depletion of water shall cause the owners of senior decreed water rights to be unable to divert their decreed amounts of water by pumping from a well extending through the depth of the formation from which said water is decreed." Other restraints not here material were placed upon said defendants.

The only plaintiffs in error who seek reversal of the judgment, or any part thereof, are the State Engineer and subordinate water officials who take exception to the mandate of the trial court that they shall, " * * * control and administer said underground waters and wells in the same manner and to the same purpose as in the case of diversions from public streams of the State of Colorado." All those persons who were defendants in the trial court and who do not join as plaintiffs in error were named as defendants in error and are parties to the action in this court. The plaintiffs in the trial court are also named as defendants in error. Only one of them, namely J. Lewis Ford, has appeared in this court to contest the issues raised by the attorney general on behalf of the state officials.

We are dealing here with waters which are admittedly not tributary to any natural stream. The purported decree of 1948 specifically so found; and it is conceded by the parties in the instant action that the waters contained in the aquifers involved are not waters which would ever become a part of any natural stream. In the

pre-trial conference memorandum dated June 10, 1959, the trial court recited that the waters involved were, " * * * not tributary to any stream * * * ." In the final judgment and decree the trial court said, inter alia, "The basin; *which is closed,* is very large, and some of the aquifers are very thick." (Emphasis supplied.)

Counsel for J. Lewis Ford, the only party to the action in this court who appears to dispute the position taken by the attorney general, makes the following statement as definitive of the issue for determination:

"Ford is agreeable to resting the appeal on the questions of (1) whether the District Court had jurisdiction to give him a decree for water, not tributary to a stream, out of a confined aquifer and (2) whether the District Court can call on the State Engineer to assist in enforcing its sanctions against junior wells having no decrees. * * * "

The controlling question which we are called upon to determine is, whether the doctrine of prior appropriation of water to beneficial use is applicable to underground waters which are not tributary to any natural stream, and so results in a priority of right to the water thus used.

The constitution of the state of Colorado (Article XVI, Section 5) provides:

"The water of every *natural stream,* not heretofore appropriated, within the state of Colorado, is hereby declared to be the property of the public, and the same is dedicated to the use of the people of the state, subject to appropriation as hereinafter provided." (Emphasis supplied.)

Section 6 of said Article in pertinent part reads as follows:

"The right to divert the unappropriated waters of any *natural stream* to beneficial uses shall never be denied. Priority of appropriation shall give the better right as between those using the water for the same purpose; but when the waters of any *natural stream* are not suffi-

cient for the service of all those desiring the use of the same, \* \* \* ." (At this point the section names certain uses in the order of their preference.) (Emphasis supplied.)

Thus the constitutional provisions referred to make specific reference in recognizing the "appropriation" doctrine only to the waters in "natural streams."

C.R.S. '53, 147-11-1 to 6, provides for the appointment of a state engineer and defines his duties. We direct attention to a few pertinent passages from this chapter as follows:

147-11-3: "The state engineer shall have general supervising control over the public waters of the state. [The public waters of the state as defined by the constitution are the waters in "natural streams."] He shall make or cause to be made careful measurements of the flow of the *public streams* of the state from which water is diverted for any purpose, and compute the discharge of the same." (Emphasis supplied.)

In 147-11-6 we find: "The state engineer shall perform all duties imposed upon him by law, and when called upon by the governor, shall give his counsel \* \* \* ."

 Our water adjudication statute was adopted in 1943. A careful examination of the sections thereof leads to the conclusion that they were not designed or intended to apply to wells drawing water from a closed artesian basin from a supply which is not tributary to any stream. For example in 147-9-1 the term "court" is defined as the court having jurisdiction of the adjudication of water rights in a particular water district. 147-13-1 provides that water districts are established to include lands irrigated from ditches "taking water from the following described *rivers or natural streams* of the state of Colorado \* \* \* ." (Emphasis supplied.) The entire plan of the water adjudication act is based on the concept of "rivers and natural streams."

In *Safranek, et al., v. Town of Limon,* 123 Colo. 330, 228 P. (2d) 975, it was held that there is a presumption

that underground water is tributary to a natural stream in the watershed in which it is found and that he who asserts that underground water is not tributary to a stream has the burden of establishing that fact. In the absence of such evidence the presumption prevails. From the opinion in that case we quote the following:

"Had it been established by the record in this case that the water diverted by the town was nontributary ground water, such as an underground lake, the waters of which are not a part or source of a natural stream, still the above-quoted statement upon which counsel for respondents base their claim of ownership of the water would not be a correct statement of Colorado law. [The statement referred to was that sub-surface waters not tributary to any stream are the property of the owners of the land as at common law.] * * * Whether in such case we should follow the California doctrine of reciprocal rights, * * * or whether we should extend one step further our Colorado doctrine of first in time, first in right, need not now be determined. * * * "

It is also stated in *Safranek* that if there had been proof that the waters there involved were nontributary, " * * * we would, in such case, be confronted with the question upon which there is an absence of statutory law in Colorado as well as of direct decision of our courts. * * * "

The *Safranek* opinion was announced March 5, 1951, and the Colorado Ground Water Act was thereafter adopted in 1957. The story behind that statute and an understanding of the original form in which it was presented to the legislature and the drastic changes which were made in it before adoption, will lead inescapably to the conclusion that the general assembly painstakingly and purposely excluded nontributary underground water from coverage under the doctrine of appropriation. We think it important to briefly trace the legislative history of the Ground Water Law of 1957.

Senate Bill 113 (Colorado Ground Water Law), as

*originally printed and introduced* in the Colorado Senate, contained, inter alia, these significant provisions:

"1. AN ACT RELATING TO WATER, RELATING TO THE PRODUCTION, DISTRIBUTION, AND USE OF UNDER GROUND WATER; REGULATING AND PROTECTING SUCH PRODUCTION, DISTRIBUTION AND USE; *PROVIDING FOR THE SETTLING OF THE PRIORITY OF RIGHTS* TO SUCH USE; CREATING A GROUND WATER COMMISSION; PROVIDING FOR THE REGULATION OF DRILLING WELLS; PROVIDING PENALTIES FOR VIOLATION OF THIS ACT; AMENDING SECTION 147-2-1, COLORADO REVISED STATUTES 1953; REPEALING ARTICLE 18 OF CHAPTER 147, COLORADO REVISED STATUTES 1953; AND REPEALING ALL OTHER ACTS OR PARTS OF ACTS IN CONFLICT HEREWITH. (Emphasis supplied.)

"2. SECTION 12. Priority in time shall give the better right as between appropriators of ground water. The use of ground water may be curtailed in the manner hereinafter provided when such use may, and to the extent that it does, materially and unreasonably affect the rights of senior appropriators. In any proceeding before any officer, board, commission or court between surface and ground water users, there shall be no presumption that any ground water either is or is not tributary to any surface stream, and in the determination of whether the use of ground water in any case should be so curtailed, the only consideration shall be whether or not the use does so materially and unreasonably affect the rights of senior appropriators, which question shall be determined in accordance with the facts as they may appear to be and without resort to any presumption or burden of proof. As among appropriators of ground water, a senior has no right to a continuation of the ground water level that existed at the time he made his appropriation, but has the right to a continued flow of water from the aquifer from which his appropriation derives its supply, in such quantity, quality and

at a level which will not materially injure the senior appropriator.

"Whenever the commission shall determine, upon recommendation by the district advisory board or upon demand of an aggrieved appropriator, that withdrawals of ground water within a restricted district materially and injuriously affect the rights of senior appropriators of ground water, the state engineer shall either limit such withdrawals in the inverse order of the dates of such priorities, or impose such terms and conditions upon continued use as may be agreed upon by consultation with the district advisory board.

"Whenever the state engineer shall make an order limiting withdrawals by priority or by imposing terms as hereinabove provided, upon request of any appropriator affected by this order, the commission shall hold a hearing to hear all pertinent objections to the order and at the conclusion of the hearing, the commission shall affirm the order or modify the same in such particulars as it may determine. Such hearing, if need be, may be continued from day to day in order that all pertinent facts may be presented to the commission for its consideration.

"Whenever the commission places a ground water aquifer on priorities, or limits a ground water use for the benefit of a senior appropriator or appropriators, any ground water user aggrieved by such order may petition the district court having jurisdiction over the adjudication of surface waters wherein his well is located to determine the extent of the aquifer from which he draws water, the relative priority dates of all appropriators drawing therefrom and the effects of such uses upon other ground water rights. Such adjudication shall be conducted in the manner provided by law for surface water adjudications, except that in addition to the notice provided to be given in the adjudication of surface water, notice shall also be given by mailing notice of the proceeding by first class mail to all water

users who have filed statements of claim hereunder or obtained permits hereunder for appropriations of water from the same aquifer; said notices to be mailed at least sixty days prior to the date set by the court for the hearing on such adjudication. The decree fixing the rights of the appropriators shall be filed with the state engineer and serve as the basis for further administration of priorities to the use of water from such aquifer. A ground water decree entered pursuant to this section shall have the same effect for all purposes as a surface water adjudication decree and the failure of a ground water appropriator to appear in an adjudication of water rights to the aquifer from which he draws water shall have the same effect as the failure of a surface water appropriator to appear in a surface stream adjudication."

It is significant that Section 12 as above set out was, on March 14, 1957, stricken in its entirety by the Senate (page 508, Senate Journal, 41st General Assembly), and further, that on March 18, 1957, the Senate further amended said bill by:

(a) Striking from the title as hereinabove set out, the words "providing for the settling of the priority of rights to such use," (page 534, Senate Journal, 41st General Assembly); and (b) providing for some 40 amendments thereto by striking therefrom the words "appropriator" and "appropriation" and substituting the words "user" and "use," (pages 535 and 536, Senate Journal, 41st General Assembly.)

Senate Bill 113 as above amended was referred to the House on March 26, 1957, and the House, realizing the futility of trying to delete all references recognizing the appropriation of artesian water, amended the Senate Bill in its entirety (page 575, House Journal, 41st General Assembly), which bill, as amended, with minor changes, is the one which was signed into law on May 1, 1957.

The legislative history as above stated shows that the legislature attempted to remove any doubt as

to its intentions and that it contemplated under the provisions of this bill that there would be *an equitable and efficient use of nontributary underground water* not pursuant to any theory of appropriation.

The undisputed testimony of the only expert whose evidence was introduced pointed up many differences between the "closed" aquifers with which we are here concerned and those which are not "closed" but are flowing tributaries to a natural stream. We point out some of these differences which would pose insurmountable problems if an attempt should be made to apply the doctrine of prior appropriation.

1. The water bearing formations which are the sources for the water we are concerned with, consist of three principal formations, and two minor formations. The deepest is the Wingate, more than 1,000 feet beneath the surface, and about 350 feet thick. Above the Wingate is an impervious structure, and above this is the Entrada sandstone. Again, above this is an impervious layer of stone, and above this, the Morrison formation. The two lesser formations are the Burro Canyon and Dakota Sandstone, which have been and will be by us, largely ignored because of their lack of importance to the issues here. The aquifers are very "tight" and water moves through them very slowly. However, a large quantity of water is contained therein, and great pressures have built up, enough to raise the water the hundreds of feet to the surface. The fact that the pressure brings water from a well drilled into one of the aquifers above the top of the aquifer itself qualifies it as "artesian, as such is the definition "artesian."

2. These aquifers are still full of water notwithstanding withdrawals therefrom, and for many years to come will remain full, the effect of withdrawals being only to reduce pressure. Regardless of the amount of water in the aquifer, each well has a certain limit to its potential production by virtue of the nature of the

aquifer and the fact that it will only release so much water in a given time.

3. The so-called interference between these wells is limited to an interference with pressure, since the aquifer is still full of water.

4. A well will lose pressure by virtue of the withdrawal of water through that well, whether or not there is any other well in the aquifer.

5. Every well that is drilled into any part of any of the aquifers theoretically will reduce the pressure available at any other well, as well as the pressure in the well drilled.

6. The amount of interference is determined by three factors, i.e., the distance between wells, the rate of withdrawal, and the transmissibility of the aquifer. If the rate is low or the distance is great, the interference may be immeasurable for a period of years.

With these considerations in mind we consider some complex problems which the "appropriation" doctrine would be inadequate to handle.

1. Assume that the most junior well is many miles from the most senior and the intermediate well is close to the senior. The intermediate well has a greater effect on the senior in a shorter period of time, but ultimately and irretrievably the junior well will have an effect on both the intermediate and the senior well. Question: If "appropriation" doctrine is to be applied, which well should be restricted in order to protect the senior? It should be borne in mind that the senior well itself has the effect of reducing its own pressure.

2. Assume the existence of fifteen wells of varying distances from the most senior. Each will ultimately interfere to a greater or less extent with the pressure in the senior well. Question: Under the doctrine of "appropriation" are all wells except the most senior to be shut down in order to protect the pressure in the senior well?

3. If this is not to be done, what standards of inter-

ference are to be applied, and are these standards to be determined by the court?

The Colorado Ground Water Act of 1957 does not form the basis of any legal justification for the order upon the state officials to "administer" the waters contained in the aquifers involved. The primary purpose of this Act was prospectively to protect underground waters and prevent waste in their production, distribution and use. It certainly was not the intention by the adoption thereof to provide a procedure for the adjudication of water rights. The Act deals only with regulation of the manner of construction of wells to prevent waste. It is entirely prospective in operation, as indeed it must be to avoid the constitutional prohibition against the adoption by the legislature of any law which is "retroactive in its operation." (Article II, section 11). The Act provides that the Ground Water Commission may declare a given area to be a "tentatively critical ground water district" and once an area has been declared within such designation it "shall thereupon become subject to the regulations prescribed in this Article." The regulations are that after such designation no new wells can be drilled, or the water drawn from existing wells be increased unless the user shall make application in writing to the state engineer for permission to do so and the application be approved.

Except for the ministerial duty of issuing permits to existing wells and authorizing an enlarged use of such wells, Section 10 of the Act is the only section in which the legislature has authorized participation by the state engineer in its administration. The prospective nature of the Act is clearly illustrated by the following language: "The state engineer in cooperation with the commission shall have power to regulate the drilling and construction of all wells in the state of Colorado to the extent necessary to prevent the waste of water * * * ." It is difficult to find in this language any legislative authority for the engineer to function with reference to

wells which had been drilled long prior to the adoption of the Act. Every well involved in this controversy was drilled long prior to the legislative enactment. Section 10 provides two remedies for the state engineer in a situation where waste is involved. These are:

1. To go in and do the work and hold the driller liable on his bond. This can only apply to wells drilled since the adoption of the act. The wells here were drilled before the bond requirement came into existence, so there is no bond to make this remedy available.

2. The other remedy provided is to revoke the license of the driller. For the same reason as given above, this is inapplicable in the case of wells drilled before the statute became effective.

██ It is clear that these provisions were prospective only, yet the legislature was specifically legislating on the subject of waste to ground water from wells. Since the only provisions resulting from these labors *affecting existing wells are provisions for their registration (147-19-2), the obvious intent being that nothing be done in respect to waste from existing wells.* The legislature wholly failed to charge the state engineer with any duties whatever with reference to existing wells, and the fact that it is not a good thing that water be wasted from an existing well cannot serve to charge the state engineer with any duty to interfere therewith in the complete absence of legislative direction designed to effect a cure and prevent the waste of water not tributary to any public stream, and which is, accordingly, private property.

██ In the entire article the word "appropriation" appears but one time and that is in section 9 where we find: "The priority date of a ground water appropriation shall not be postponed to a time later than its true date of initiation by reason of failure to adjudicate such right in a surface water adjudication." This provision obviously was intended to apply to decreed priorities to underground water which can properly be granted

a priority under the doctrine of appropriation because it is public water, " * * * since it belongs to the river it belongs to the people of the state by article 16, section. 5 of her Constitution." *Nevius v. Smith,* 86 Colo. 178, 279 Pac. 44. The quoted section of the statute was necessary because the clear indication of numerous decisions of this court is that only that portion of underground water which supplies a natural stream is subject to the doctrine of appropriation in like manner as surface waters. As stated in *Faden v. Hubbell,* 93 Colo. 358, 28 P. (2d) 247, the reason it is thus subject to appropriation is " * * * because they [tributary underground waters] belong to the river." Section 9 above quoted should be considered in the light of subsection 7, wherein we find the following: "A permit [to dig a well] shall not have the effect of granting or conferring a ground water right upon the user *nor shall anything in this article be so construed.* * * * " (Emphasis supplied.) If, however, underground water does not belong to the river and does not contribute to a natural stream it is not public water and is not subject to the doctrine of prior appropriation.

We approve the language used by a distinguished member of the bar of this state, Mr. William R. Kelly, who has had a long and varied experience in matters involving water law in a well documented article published in Vol. 31, Rocky Mountain Law Review, at page 165,171:

"Ground water, in Colorado's century of water use development is not to be regarded as property of the public, except in such instances where it is tributary to a natural stream. True, the Colorado court has declared, under the circumstances of some cases, that there is a presumption that all water is tributary to some natural stream; but that presumption is prima facie only, and is therefore rebuttable. It has long been recognized that farmers may sink wells on their farms to make reasonable use of the ground water. Public interest

requires that a social economy built up in reliance on a principle so long recognized should not be disturbed.

"The purpose of the Ground Water Act of 1957 is to provide administration facilities to control reasonable use and to provide a record of facts upon which such reasonable use can be determined.

"It is submitted that the basis should not be, and is not, based on priority of diversion. The landowner has property in the water in his soil. It is a vested right which cannot be taken away by mere legislation. It is subject only to the reasonable use doctrine. If the ground water is in motion so as to be tributary to a natural stream, or part of the stream water table, it has always been subject to priorities of appropriation on the natural stream. But unless it is tributary to the natural stream, it is not subject to the law of appropriation."

Holding as we do that underground waters which are not tributary to any natural stream are not subject to the doctrine of appropriation, it necessarily follows that the original decrees entered by Judge Littler in the adjudication proceedings of 1948, under which the court purported to award priorities to the plaintiffs in this action, were void for want of jurisdiction over the subject matter and for a lack of power to adjudicate such rights.

It has long been established as basic law that the validity of a judgment depends upon the court's jurisdiction of the person and of the subject matter of the particular issue it assumes to decide. Considering what is meant by the term "jurisdiction" it is well settled that this term includes the court's power to enter the judgment, and the entry of a decree which the court has no authority to enter is without jurisdiction and void. A void judgment may be attacked directly or collaterally. *Newman v. Bullock,* 23 Colo. 217, 47 Pac. 379; *Atchison, Topeka and Santa Fe Railway Co. v. Board of County Commissioners,* 95 Colo. 435, 37 P (2d)

761; *Greene v. Phares, et al.*, 124 Colo. 433, 237 P. (2d) 1078; *United States National Bank of Denver v. Bartges*, 120 Colo. 317, 210 P. (2d) 600. *Davidson Chevrolet, Inc., et al., v. City and County of Denver*, 138 Colo. 171, 330 P. (2d) 1116; *Thompson v. McCormick*, 138 Colo. 434, 335 P. (2d) 265; *West End Irrigation Company, et al., v. Garvey, Exec'r., et al.*, 117 Colo. 109, 184 P. (2d) 476.

The judgment of the trial court is reversed and the cause remanded with directions to dismiss the action.

MR. JUSTICE HALL dissents.

MR. JUSTICE HALL dissenting:

I dissent.

On August 23, 1948, Judge Littler, now deceased, in Civil Action 7327 in the District Court of Mesa County, Colorado, entitled: "IN THE MATTER OF THE APPLICATION OF J. LEWIS FORD FOR AN ADJUDICATION OF HIS RIGHT TO THE USE OF ARTESIAN WATERS DERIVED FROM SUBTERRANEAN SOURCES IN MESA COUNTY, COLORADO, IN WATER DISTRICT NO. 42, and for the Adjudication of Rights in the Artesian Waters in said Mesa County for Domestic purposes." entered a decree wherein findings were made and the rights of eighteen claimants were determined. The court found, in conformity with the requirements of C.R.S. '53, 147-9-11:

" * * * as to each appropriation claimed, the priority date to which the same is entitled to relate, together with the volume thereof, the purpose thereof, the source, the point of diversion * * * ."

Among other findings made are the following:

" * * * the court further finds that Chapter 90, 1935 Colorado Statutes Annotated and acts amendatory thereof are applicable to this proceeding; that all notices required by law have been given; that hearings on proof of claims have been regularly continued from time to to time; that the notice required by law has been given

to all parties or their attorneys; that the findings and the proposed decree have been filed with the clerk of this court and that notice was given that any objections thereto have been filed; that the court has jurisdiction to enter this decree under the statutes of this state as well as under the general equitable jurisdiction of the court.

\* \* \*

"That the amount of water awarded to each of said wells under the absolute decrees herein made for domestic purposes has been placed to a beneficial use as in this decree found and determined, and the amount of water so awarded and decreed in each case is necessary, essential and beneficial for the purposes named and under the testimony and evidence taken and submitted in this proceeding such amounts of water have been appropriated, used and applied in each and every case, and that by reason thereof the claimants and parties lawfully entitled thereto have acquired a lawful and vested property right to the use of such water.

\* \* \*

"The wells involved in this proceeding are bottomed in three separate and distinct sands: the upper sand is known as the Morrison Sand, the second sand down is known as the Entrada Sand and the bottom sand as the Wingate Sand. These sands have no connection with each other and are separated by an impervious structure so that no water seeps or percolates from one to the other. The water contained in these sands is not tributary to any natural *surface* stream. All of the wells involved in this proceeding are located within the exterior boundary lines of Water District No. 42. Inasmuch as the three sands involved constitute separate sources of water, the wells bottomed in each sand respectively are given separate priorities, and each sand should be considered in effect a separate district. The legislature not having at this time assigned a number to designate these sands as separate districts, they should

be designated as zones within Water District No. 42, and accordingly, the Morrison Sand is designated as Zone No. 1 in Water District No. 42, the Entrada Sand as Zone No. 2 in Water District No. 42, and the Wingate Sand as Zone No. 3 in Water District No. 42.

"Since there has never been a prior adjudication of wells in Water District No. 42, the priorities herein shall begin with No. 1 in each sand or zone of District No. 42. Any decree which is conditional shall have suffixed to it the letter 'C' to designate it as conditional.

\* \* \*

"All water for which priorities are awarded in this proceeding shall be used for domestic purposes which shall include water for livestock. The owners of the priorities shall have the right to sell said water for domestic purposes off the premises, including the right to pipe the same to points off the premises whereon said wells are located." (Emphasis supplied.)

No steps have ever been taken to modify, set aside or review this decree.

On January 8, 1957, eight of the above mentioned claimants (to whom I refer as plaintiffs), who were decreed priorities in the above mentioned proceedings, commenced this action. They named as defendants (1) twenty-eight persons or firms, who they allege have no decreed or other rights to take water from plaintiffs' sources, who are taking water therefrom and depleting plaintiffs' decreed sources of supply; (2) ten of the above mentioned claimants, who were decreed priorities in the above mentioned proceedings, who refused to join as plaintiffs in this action and were named as defendants; (3) the State Engineer, the Division Engineer and the Water Commissioner of Water District No. 42, and (4) "All Unknown Persons who claim any interest in the subject matter of this action."

Plaintiffs sought the following relief:

1. An injunction directing the State Engineer, the Division Engineer and the Water Commissioner of Water

District No. 42 to recognize and enforce the 1948 Littler Decree.

2. A permanent injunction enjoining the twenty-eight named defendants without decreed rights from taking any water from the source of plaintiffs' supply and specifically through or by means of twenty-four named wells.

3. An order to compel the owners of any and all wells: " * * * to properly cement, case and equip the same with valves so as to prevent leakage, waste or unauthorized withdrawal of water therefrom."

On July 31, 1957, the state water officials filed a motion to dismiss plaintiffs' complaint, setting forth as grounds therefor:

" * * * that these defendants are joined only in their official capacities; that in such capacity they have no duty under Colorado law to administer any decrees establishing rights to the use of water except decrees establishing rights to the use of the public waters of the State of Colorado; that the complaint and the decree of this court in Civil Action No. 7327 (Littler Decree) * * * conclusively show that the said decree is not one for the use of the public waters of the State of Colorado; and that, therefore, the complaint does not state a claim against these defendants upon which relief may be granted."

This motion was, on October 7, 1957, overruled and on October 16, 1957, these defendants filed their answer wherein:

1. They admit certain allegations of plaintiffs' complaint, and deny others;

2. as affirmative defenses, allege that the plaintiffs have not exhausted their administrative remedies under the statutes of the State of Colorado;

3. that the complaint does not state a claim upon which relief may be granted and "that the Court is without jurisdiction over the subject matter of this action."

On March 4, 1957, a MOTION TO DISMISS plaintiffs' action was filed by " * * * defendants herein who are represented by their respective attorneys and who are appearing specially for the purpose of this Motion only, * * * ."

Urged as ground for dismissal is the following:

"That this Court has no jurisdiction of said supposed cause of action set forth in the Complaint herein for the reason that the purported decree of this Court of August 23, 1948, determining that that Court had jurisdiction to adjudicate rights in artesian waters in Mesa County under the statute of this State and its equitable powers was null and void and without the powers of this Court under the Constitution and Statutes of this State."

This motion was finally overruled on October 9, 1957, and the defendants were given ten days to answer, "unless some Defendant desires to stand on Motion to Dismiss * * * ." Significantly not one defendant saw fit to stand on his position that the Littler decree was void.

On June 30, 1958, twenty of the defendants, some having decreed rights, others having wells but no decreed rights, filed an answer wherein they set forth that:

1. The complaint does not state a claim;

2. admit certain allegations of the complaint and deny other allegations;

3. (as an affirmative defense) allege that the plaintiffs are using more water than was decreed to them and for purposes other than designated in their decrees (a position wholly inconsistent with the contention that the Littler decree is void).

They pray that plaintiffs' complaint be dismissed and that they be awarded such relief as may seem proper to the court.

On October 16, 1957, McCoy Company, owner of an unadjudicated well, filed its answer wherein it admits most allegations of plaintiffs' complaint and denies other allegations. It prays that plaintiffs' complaint be dismissed and that it be awarded costs and general relief.

On February 13, 1957, Holly Sugar Corporation, named as a defendant, owner of a well with a decreed right, filed its separate answer wherein it sets forth the terms and extent of its "No. 2 Priority as of October 1, 1923, from the Wingate Sand * * * ."

It asks for " * * * judgment and relief as it may be entitled to herein."

On October 25, 1957, defendant Fleck, owner of a well with a decreed right, and *defendant Reinhardt, owner of a well with no decreed rights,* filed a document labeled as a joint "STATEMENT OF POSITION" wherein they assert that the Littler decree is valid and binding upon all parties to this action. They allege that their statement shall not be construed as an admission or denial of any issues in the case.

Eight other defendants, all of whom were duly served with process, failed to enter any appearance and their default was duly entered on February 28, 1961, prior to trial.

Judge Hughes, who was then presiding over the case, in his order denying defendants' motions to dismiss on the ground that the Littler decree was void, stated among other things:

"Judge Littler, now deceased, took jurisdiction of the petition and the subject matter involved, and after taking evidence entered a decree which fixed priorities for certain wells, which are those owned by plaintiffs in the present action and their predecessors in interest. This decree reads, and provides in part as follows: 'That the Court has jurisdiction to enter this decree under the statutes of this state, as well as under the general equity jurisdiction of the Court.'

"The Court states that the wells involved are bottomed in three separate and distinct sands; that the waters contained in these sands are not tributary to any natural *surface* stream; that each sand involved constitutes a separate source of water. The decree contains the usual provisions about economic use of water, etc.

"Judgment was then given by decrees to the various wells involved. These decrees stated the purpose of use; the stratum of sand from which it was taken; and the amount of water decreed, both absolute and conditional.

"The question before the Court is whether these decrees are valid in law.

"The Case of Coffin vs. Left Hand Ditch Company, 6 Colo. 443 is the first to discuss water rights applicable to the State of Colorado. Judge Helm states in this decision; that the common law doctrine of riparian ownership is inapplicable to Colorado. 'Imperative necessity, unknown to the countries which gave it birth, compels the recognition of another doctrine in conflict therewith. And we hold that, in the absence of express statutes to the contrary, the first appropriator of water from a natural stream for beneficial purposes has, * * * a prior right thereto, to the extent of such appropriation.'

" 'The doctrine of priority of right by priority of appropriation for agriculture is evoked, as we have seen, by the imperative necessity for artificial irrigation of the soil.'

\* \* \*

"We therefore find that the Colorado Supreme Court did recognize that through necessity, throughout our state, water could be appropriated and priority of appropriation recognized without reference to legislation upon the subject. It is true that Judge Helm was talking about the waters of natural streams, and that it was these waters that were involved. It is also true that he refers to 'custom.' In the Court's opinion, this does not detract from the proposition that it was recognized that appropriation of water could be made and protected by the Court in the absence of legislation to the contrary." (Emphasis supplied.)

\* \* \*

"Our present irrigation statutes provide for the hearing, adjudicating and settling of all questions concern-

ing the priorities of appropriation of water between owners and claimants of water rights drawing water from the same source within the same water district, and all other questions of law flowing out of, or in anyway involved or connected therewith.

"It also recognizes sources of water as being natural streams, systems or other sources of water.

"The previous statute, C. S. A. Chapter 90, Section 158 concerning the same subject matter, provides that any one or more persons, associations or corporations interested as owners of any ditch, canal or reservoir should have their priority of right adjudicated, and further provides that the adjudication of priority of rights should be to the use of water for irrigation between the several ditches, canals and reservoirs.

"We therefore see that the legislature has changed the law of adjudication of priorities, or questions upon which the court in adjudication proceedings has jurisdiction, from those owning an interest in a ditch, canal or reservoir, to 'hearing, adjudicating and settling all questions concerning the priority of appropriation of water between owners and claimants of water rights.'

"On its face our last statute, which was enacted in 1943, would cover adjudication of all priorities to the use of water to which the rights of priority by use could be made. And certainly this would apply to underground water as well as to surface water.

\* \* \*

"The Court further concludes that the language of our adjudication proceedings as contained in the 1943 statutes is broad enough, and was intended by the legislature, to cover all water in the State of Colorado."

In my opinion Judge Hughes' analysis of the problem and resolution thereof is correct.

A pretrial conference was held on October 19, 1960, at which time Judge Kempf entered an order stating the issues and his view of the law governing the case. He set the case for trial on May 1, 1961.

Trial was to the court which, among other things, found the following facts:

"6. The aquifers in question are relatively impermeable and the movement of water through them is very slow. The basin, which is closed, is very large and some of the aquifers are very thick. It is impossible with present knowledge to calculate the refilling rate, but it is very slow. Due to the depth of the aquifers, the low storage capacity per cubic foot of rock, and the low transmissability, the cost of drilling wells compared with the amount of water recovered has restricted the use of this water to domestic or industrial purposes rather than irrigation.

\* \* \*

"7. In the event that a senior decreed appropriator cannot obtain his water from his well by deepening it and pumping, then it is the duty of the water officials, on demand, to close down junior wells in proximity until the senior appropriator can obtain his water." And stated:

"As to the law applicable, the Court concludes:

1. The underground waters are public and subject to private appropriation by putting to beneficial use, and the decree adjudicating priorities is valid.

2. The right acquired by an appropriator is the right to divert water at the well location in the zone in which it is bottomed for such beneficial use.

3. It is contrary to the law to waste this water when it is brought to the surface or to alter the natural conditions by drilling, operating or maintaining any well which allows water to flow from one formation of greater pressure to one of less pressure, whether by perforating casing in more than one formation or because of leakage around the casing of a well or lack of casing.

4. There is no vested right in the maintenance of artesian pressure and a senior appropriator is not injured if he is required to deepen or enlarge his well or to in-

184

stall a pump so long as he can thus obtain his decreed or appropriated amount of water.

5. This is an action in personam and not in rem.

6. The State Engineer and subordinate water officials are under the duty imposed by existing statutes to administer the water of these aquifers and enforce priorities decreed thereto as in the case of diversions from public streams of this state, and to require the persons owning or possessing such wells (1) to install shutoff valves or devices to enable the flow to be cut off, (2) to case and cement each well or take such other action as is necessary to prevent the running of water from one formation to another, (3) to cease all waste of water from such wells after it reaches the surface, (4) to install a meter on each well to measure the quantity of water taken therefrom, (5) to allow the performance of such tests or measurements as may be required to determine from time to time the hydrostatic head or other facts concerning such well. The State Engineer and subordinate water officials are under the duty to make and maintain records of the data obtained regarding each such well.

7. In the event that a senior decreed appropriator cannot obtain his water from his well by deepening it and pumping, then it is the duty of the water officials, on demand, to close down junior wells in proximity until the senior appropriator can obtain his water."

The Decree provides:

"1. That the decree entered in Civil Action No. 7327 in this Court on August 23, 1948 is valid and in full force and effect as a decree fixing priorities for the use of public waters in the Entrada, Morrison and Wingate sandstones underlying lands in Mesa County, Colorado.

"2. That defendants J. E. Whitten, State Engineer of Colorado; Frederick W. Paddock, Irrigation Division Engineer of Division No. 4; and Woodrow W. Saunders, Water Commissioner of Water District No. 42, are here-

by ordered to control and administer said underground waters and wells in the same manner and to the same purpose as in the case of diversions from public streams of the State of Colorado. In particular, but without limitation thereto, they shall require persons owning or possessing such wells to do the following:

(a) To install shutoff valves or devices to enable the flow to be cut off.

(b) To case and cement each well or take such other action as is necessary to prevent the running of water from one formation to another.

(c) To cease all waste of water from such wells after it reaches the surface.

(d) To install a meter on each well to measure the quantity of water taken therefrom.

(e) To allow the performance of such tests or measurements as may be required to determine from time to time the hydrostatic head or other facts concerning such well; and said officials shall make and maintain records of the data obtained by them regarding each such well."

3. That the following named defendants "* * * are hereby permanently enjoined and restrained from doing or allowing to be done any of the following:

A. Wasting any water brought to the surface in any well owned, possessed or controlled by them from any of the water-bearing formations known as the Entrada, the Morrison and the Wingate sandstones.

B. Possessing or maintaining any well in which water may flow from one of said water-bearing formations into another, or into any other formation underground.

C. Taking water from any well or allowing the same to flow from such well when such depletion of water shall cause the owners of senior decreed water rights to be unable to divert their decreed amounts of water by pumping from a well extending through the depth of the formation from which said water is decreed.

D. Failing or refusing to comply with orders of the

State Engineer of Colorado and subordinate water officials made pursuant to this decree."

The only parties who have entered an appearance here are the official defendants and the plaintiff Ford, the same Ford who applied for the adjudication before Littler.

The official defendants contend that the waters involved are such that the doctrine of prior appropriation cannot logically be applied thereto and that there is no legislative duty on them to control or administer such waters or to carry out the trial court's ruling. They urge that this court correct the errors of the trial court and announce the law applicable in circumstances such as we have here. Ford urges that the judgment be affirmed.

So far as the record before us discloses, not one of the eight plaintiffs or the thirty-eight nonofficial defendants who had their respective rights and duties adjudicated by Judge Kempf in this case has ever voiced any disapproval of his decree or taken any steps to have the same vacated or modified.

In the majority opinion it is stated:

"The controlling question which we are called upon to determine is, whether the doctrine of prior appropriation of water to beneficial use is applicable to underground waters which are not tributary to any natural stream, and so results in a priority of right to the water thus used."

I do not accept the foregoing statement as the problem presented for our determination.

That problem was resolved by Judge Littler in 1948. All of the parties to that proceeding, also all of the parties to this proceeding whose rights and duties were adjudicated by the trial court, have been made parties here, and all (except the plaintiffs in error) have been summoned to appear in this court, as provided by Rule 111 (e), R.C.P., Colo. Ford and none other has appeared and he urges that the judgment be affirmed.

Plaintiffs in error seek reversal of that portion of the

judgment which orders them to do certain specified acts in connection with administering the waters decreed to the various well owners.

In my humble opinion the controlling and only question properly before us for consideration is the correctness of that part of the judgment directing the water officials to do certain acts "* * * in the same manner and to the same purpose as in the case of diversions from public streams of the State of Colorado."

The majority opinion, in outlining the duties of the state engineer and his subordinates, refers to C.R.S. '53, 147-11-1, 3 and 6. The foregoing legislative directives were adopted in 1889. They may well have been adequate in 1889 when the state was in its infancy and underground and ground waters were a matter of little or no concern to anyone. However, as hereinafter pointed out, his duties were substantially increased by the 1957 "Colorado Ground Water Law."

The majority opinion deals extensively with "the legislative history of the Ground Water Law of 1957," and it would seem may well have predicated its decision on inferences drawn from the fact that the legislature rejected and struck certain proposals from the initial draft of the act. I do not subscribe to that line of reasoning. What a legislative body does not do does not change the course of human events. In 1957 the legislature did adopt the "Colorado Ground Water Law." Inferences drawn from inaction of the legislature in certain areas must yield to its positive pronouncements. There are several pronouncements in the 1957 act which in my opinion are very pertinent in resolving the problems presented to the trial court, language which indicates an intention to confirm the holdings of Judges Littler, Hughes and Kempf, that all migrant waters are public waters and subject to appropriation, as are the waters of flowing streams, sanctioning the court's directions to the state engineer.

In this respect I consider the following provisions of the act as highly significant:

1960 Perm. Supp., C.R.S.:

"*147-19-1 Definitions.* — (1) The term 'user' as used herein shall mean any individual * * * making a beneficial use, or taking steps or doing work preliminary to making a beneficial use of *underground waters of Colorado.*

"(2) The terms 'underground water' and 'ground water' are used interchangeably in this article and refer to *any water not visible on the surface of the ground under natural conditions.*

"(3) The term 'aquifer' means a geological formation that contains *or transmits ground water.*" (Emphasis supplied.)

"*147-19-2.* (1) Existing ground water uses shall be as fully recognized as if this article had been in force *at the time of their initiation.* Within three years after the effective date of this article, however, all users of ground water shall file statement of their use with the state engineer, setting forth such information as may reasonably be required by the state engineer *for the proper administration of this article,* including but not limited to the following: * * * the location of the well or tunnel or other means of diversion * * *; the nature and extent of use; * * * *the date when work on diversion facilities was commenced,* and *the date when water was first applied to a beneficial use* * * *.

* * *

"(3) The state engineer shall file and preserve such statements and make a record thereof in his office so indexed as to be useful to users in determining the extent of use made from various water sources, and shall issue a permit for each use. Failure to file a statement of use * * * shall be prima facie evidence of an intent *to abandon such use;* and in administering the underground waters of this state * * * the state engineer may disregard any use not so filed." (Emphasis supplied.)

"*147-19-5*. (1) From and after the date this article becomes effective, no new wells shall be drilled, nor the supply of water from existing wells increased or extended, unless the user shall make an application in writing to the state engineer, for a 'permit to use ground water,' setting forth * * * the proposed use for which the use is intended, *the date of the initiation of the use* * * *." (Emphasis supplied.)

"*147-19-6*. The state engineer shall provide regulations under which an existing well may be modified by change of the well itself, the pumping equipment therefor, by the drilling of a substitute well, or otherwise in order to make it possible for the owner of a well to obtain the water to which such owner *is entitled as initiated by the original well*." (Emphasis supplied.)

"*147-19-9*. *The priority date of a ground water appropriation shall not be postponed to a time later than its true date of initiation by reason of failure to adjudicate such right in a surface water adjudication*." (Emphasis supplied.)

"*147-19-10*. (1) The state engineer * * * shall have power to regulate the drilling and construction of all wells in the state of Colorado * * * to prevent the waste of water * * *.

"(2) If the state engineer finds any well to have been drilled or maintained in a manner or condition contrary to any of the provisions of this article or the regulations issued hereunder, he shall immediately notify the user in writing of such violation and give him such time as may reasonably be necessary, not to exceed sixty days, to correct deficiencies. If the user fails or refuses to make the changes within the allowed time the state engineer is authorized to enter upon his land and do whatever is necessary that the user comply with the provisions of this article or regulations issued hereunder."

In the foregoing legislative pronouncements are many words peculiarly adapted to our procedures leading up to the acquisition of a decreed priority to the use of public

waters. To mention some: "beneficial use," "diversion," "date when diversion facilities was commenced," "the date when water was first applied to beneficial use," "evidence of an intent to abandon such use," "the date of the initiation of the use," "to obtain the water to which such owner is entitled as initiated by the original well." These words are common parlance in water adjudication proceedings; they are meaningful and cannot be ignored or their force minimized because the legislature saw fit to not use other proposed words.

The majority opinion contains the following:

"The legislative history as above stated shows that the legislature attempted to remove any doubt as to its intentions and that it contemplated under the provisions of this bill that there would be an equitable and efficient use of nontributary underground water *not pursuant to any theory of appropriation.*" (My emphasis.)

The fact that the legislature said:

"The *priority date* of a ground water appropriation shall not be postponed to a time later than its true *date of initiation* by reason of *failure to adjudicate such right* in a surface water adjudication." (Emphasis supplied.) impels me to a conclusion not in keeping with that expressed by the majority.

I find great difficulty in determining from the record before us the nature of the waters involved. Judge Littler found that "the water contained in these sands is not tributary to any natural *surface* stream." Whether the word *"surface"* was used advisedly and for a purpose is not disclosed by the record. Certainly the water was not tributary to a surface stream—yet it might well be tributary to a stream. Further confusion as to the nature of the waters involved arises out of testimony and comments and findings of the trial court in this case. Statements to the effect that the water moves slowly through relatively impermeable aquifers, that percolation is very slow, replenishment and recharge requires a long period

of time, and there was not available any practical means of computing the recharge rate. All of which creates in my mind grave doubts as to whether the waters are tributary. If moving, however slowly, they are going somewhere, they are seeking lower ground and presumably are tributary. They are here today and gone tomorrow, which is inconsistent with any contention that they are a part of the lands.

The 1957 Colorado Ground Water Law, in defining "aquifers" and "ground water," would seem to have contemplated this exact situation. In defining an aquifer as "* * * a formation that * * * transmits ground water," the legislature has negated the idea of a closed basin. In defining ground water as "any water not visible on the surface of the ground," the legislature does not exclude ground waters that might be tributary.

In the case before us the waters are in an aquifer, where they are transmitted, are being replenished, and they are subject to the rule stated in *Safranek v. Limon,* 123 Colo. 330, 228 P. (2d) 975:

"* * * Under our Colorado law, it is the presumption that all ground water so situated finds its way to the stream in the watershed of which it lies, is tributary thereto, and subject to appropriation as part of the waters of the stream. *DeHaas v. Benesch,* 116 Colo. 344, 181 P. (2d) 453. The burden of proof is on one asserting that such ground water is not so tributary, to prove that fact by clear and satisfactory evidence. * * *."

I do not agree that the Littler decree is void. The waters involved, public or private, are in Water District No. 42, the district over which Judge Littler presided. Certainly he, if anyone, had jurisdiction over the subject matter. Certain parties, including Ford, sought to have their respective rights to water adjudicated. The court had jurisdiction over the parties voluntarily appearing before him and also those brought before him by proper process. There was no other place for the parties to go to

have their respective claims to the waters involved determined.

In the majority opinion it is stated:

"* * * the * * * decrees entered by Judge Littler * * * were void [1] for want of jurisdiction over the subject matter and [2] for a lack of power to adjudicate such rights."

It would seem that the subject matter was the water and clearly it was subject to his jurisdiction, just as land, minerals, cattle or other property in his district. Possibly the majority opinion, in speaking of subject matter, refers to water adjudication proceedings—clearly he had statutory authority and duty to conduct such proceedings and, according to the pronouncement of this court in *Coffin, et al., v. Left Hand Ditch,* supra, he could conduct adjudication proceedings without statutory authority.

Judge Littler was duty bound to resolve matters brought before him. Here, one of the problems presented was to decide whether the waters involved were subject to appropriation and decree. Apparently the majority take the position that he had jurisdiction to say "No," but lacked jurisdiction to say "Yes." To that I do not subscribe.

The judgment should be affirmed.