The BOARD OF COUNTY COMMISSION-ERS OF the COUNTY OF PARK and James B. Gardner and Amanda Wood-bury, Plaintiffs–Appellants,

v.

PARK COUNTY SPORTSMEN'S RANCH, LLP, a limited liability partnership, Defendant–Appellee.

No. 01SA56.

Supreme Court of Colorado, En Banc.

April 8, 2002.

See also 986 P.2d 262.

Bernard, Lyons, Gaddis & Kahn, P.C., Jeffrey J. Kahn, Steven P. Jeffers, Longmont, Colorado, Attorneys for Plaintiff–Appellant Board of County Commissioners of the County of Park.

Felt, Monson & Culichia, LLC, James W. Culichia, James G. Felt, Colorado Springs, Colorado, Attorneys for Plaintiffs–Appellants James B. Gardner and Amanda Woodbury.

Jean E. Dubofsky, P.C., Jean E. Dubofsky, Boulder, Colorado, Attorney for Plaintiffs–Appellants Board of County Commissioners of the County of Park and James B. Gardner and Amanda Woodbury.

Bennington, Johnson & Reeve, P.C., Kenneth J. Burke, Denver, Colorado, Attorneys for Defendant–Appellee Park County Sportsmen's Ranch, LLP.

Timothy R. Buchanan, P.C., Timothy R. Buchanan, Arvada, Colorado, Attorney for Amicus Curiae Fort Morgan Reservoir and Irrigation Company and the North Sterling Irrigation District.

Hill & Robbins, P.C., David W. Robbins, Dennis M. Montgomery, Denver, Colorado, Attorneys for Amicus Curiae Rio Grande Water Conservation District.

Carlson, Hammond & Paddock, LLC, William A. Paddock, Denver, Colorado, Attorneys for Amicus Curiae Rio Grande Water Conservation District.

Carlson, Hammond & Paddock, LLC, Mary Mead Hammond, Denver, Colorado, Attorneys for the Irrigationists Association.

Trout, Witwer & Freeman, P.C., Robert V. Trout, Adam T. Reeves, Denver, Colorado, Attorneys for Amicus Curiae Northern Colorado Water Conservancy District.

Grimshaw & Harring, P.C., Wayne B. Schroeder, Jody Harper Alderman, Julie K. Blakely, Denver, Colorado, Attorneys for Amicus Curiae Douglas County Water Resource Authority.

Justice HOBBS delivered the Opinion of the Court.

In this appeal from a judgment of the District Court for Water Division No. 1 (Water Court), Plaintiffs–Appellants, the Park County Board of County Commissioners, James B. Gardner, and Amanda Woodbury (Landowners) claimed in a declaratory judgment action that the applicant for a conditional water right, Park County Sportsmen's Ranch, LLP (PCSR) has "no right to occupy the space beneath the lands of the Plaintiffs to store water or other substances on or below the surface of the lands. Any such placement or storage of water on or below the surface constitutes a trespass for which the Defendant may be liable for damages." For this proposition, the Landowners rely upon the common-law property doctrine "Cujus est solum ejus est usque ad coelum et ad inferos"[1] (cujus doctrine). The Landowners also contend that Article XVI, sections 14 and 15, section 37–87–101(1), and other statutes require PCSR to obtain consent or condemn property interests and pay just compensation to them in connection with its conjunctive use project[2] even though PCSR does not propose to drill into or locate any of its project's facilities on or within the Landowners' properties.

The Water Court determined that: (1) artificial recharge activities involving the movement of underground water into, from, or through aquifers underlying surface lands of the Landowners would not constitute a trespass; and (2) PCSR's proposed project would not require the Landowners' consent or condemnation and the payment of just compensation under the provisions of Article XVI, sections 14 and 15, section 37–87–101(1), or the other statutes the Landowners invoke, because the project did not involve the construction of any facilities on or in the Landowners' properties. We agree with the Water Court and uphold its judgment.

## I.

The Landowners and PCSR own property in South Park, Colorado, a high mountain valley approximately seventy-five miles southwest of Denver. PCSR filed with the Water Court an application for a conditional water rights decree and plan for augmentation and exchange involving extraction from and recharge of water into the South Park formation for augmentation, storage, and beneficial use. The South Park formation is a natural geological structure containing aquifers PCSR intends to utilize in connection with its project.

PCSR owns 2,307 acres of land in South Park. As part of its conditional water rights application and plan for augmentation and exchange, PCSR claimed the right to occupy saturated and unsaturated portions of the South Park formation for water extraction, augmentation, and storage as part of a water project it calls the South Park Conjunctive Use Project intended for City of Aurora municipal use. Project features would include

---

1. This phrase translates to mean: "To whomsoever the soil belongs, he owns also to the sky and to the depths." *See* Norman W. Thorson, *Storing Water Underground: What's the Aqui–Fer?*, 57 Neb. L.Rev. 581, 588 (1978).

2. The question the Landowners phrase on appeal is whether "the appropriator of a water right [may] store water in an underground reservoir below the surface of lands owned by others without obtaining an easement or consent from the landowners."

twenty-six wells to withdraw water from the South Park formation and six surface reservoirs for artificially recharging the aquifers. PCSR's application did not propose to locate any of the project's recharge and extraction features on the Landowners' properties.

We have previously determined that the aquifers of the South Platte formation are tributary to the natural stream and projects affecting them are subject to Colorado's prior appropriation law. *See Park County Sportsmen's Ranch v. Bargas,* 986 P.2d 262, 275 (Colo.1999). PCSR's Water Court application sought a decree for aquifer water extraction, recharge, augmentation, exchange, and storage activities, identifying two "Reservoir Zones" within the South Platte formation in connection with its claimed "conditional underground storage rights," each zone having a volume of 70,000 acre-feet of water for a total of 140,000 acre-feet extending under approximately 115 square miles of land.

The Landowners objected to PCSR's Water Court application. They also filed a complaint for declaratory relief in the Park County District Court seeking a determination that the placement or storage of water above or below the surface of their lands, absent their consent, would constitute a trespass.

On June 14, 1999, PCSR filed a motion to transfer venue of the declaratory judgment action to the Water Court, which the Park County District Court granted.[3] After the change of venue, PCSR answered that its project did not require the Landowners' consent. The Landowners filed a motion for summary judgment in the declaratory judgment action, which the Water Court denied on August 25, 2000.

The Water Court found that PCSR's project did not include the construction of any facilities on or in the Landowners' properties and the Landowners had not alleged that the use, benefit, and enjoyment of their properties would be invaded or compromised in any way. The Water Court determined as a matter of law that PCSR's project did not require the Landowners' consent or condem-

nation and payment of just compensation. The Water Court ruled that: (1) the property rights of the Landowners do not include ownership of waters tributary to a natural stream; (2) natural streams crossing the property of another may be utilized, without consent, for the transportation of water by a lawful appropriator; (3) natural stream water includes the water in the aquifers; (4) water is treated differently from a property owner's traditional rights in the land estate; (5) Colorado's eminent domain law applies only if the holder of the water use right constructs facilities on or in a non-consenting landowner's property; (6) Colorado law encourages rather than restrains the efficient utilization of the state's scarce water resources; (7) the General Assembly intended to authorize artificial recharge of natural subsurface formations and conjunctive use of ground water placed therein, as part of its maximum utilization goal for beneficial use of water; and (8) the movement of underground water into, from, or through land underlying another's property, resulting from artificial recharge into an aquifer by the holder of a decreed water right, does not constitute a trespass. At the Landowners' request, the Water Court entered judgment in favor of PCSR so that the Landowners could appeal the court's declaratory judgment ruling to us.

In PCSR's water decree application proceeding, the Water Court denied PCSR's application for a conditional decree on June 1, 2001. The Water Court determined among its findings and conclusions that: (1) PCSR's ground water model was not sufficiently reliable to permit a reasonably accurate determination of the timing, amount, and location of stream depletions or to determine the rate of aquifer recharge resulting from PCSR's recharge facilities; (2) PCSR's surface flow model was insufficiently reliable to determine stream flow or legal availability of water for PCSR's project and the model's results overestimated streams flows available to PCSR; and (3) PCSR had failed to meet its burden to quantify injurious depletions in time, place, and location in connection with

---

**3.** *See Crystal Lakes Water & Sewer Ass'n v. Backlund,* 908 P.2d 534, 539 (Colo.1996) (stating that water matters concern water use rights); *Oliver*

*v. Dist. Court,* 190 Colo. 524, 526–27, 549 P.2d 770, 771–72 (1976) (recognizing ancillary jurisdiction in water matters).

its augmentation plan. The Water Court characterized PCSR's project application as "a scheme to augment out-of-priority depletions with additional out-of-priority pumping" that would "exacerbate depletions to the aquifer and the river system."

PCSR is presently in the process of appealing to this Court the Water Court's dismissal of its decree application.[4] As a result of the dismissal and appeal, the Landowners suggest that the Water Court's judgment in the declaratory judgment case before us may be moot or not ripe for decision. We do not agree; however, our decision herein does not address the merits of PCSR's application or the Water Court's rulings in that case. Rather, we address the threshold issues litigated by the Landowners and PCSR in the declaratory judgment action: whether artificial recharge and storage of water that enters portions of the aquifer beneath the surface of a person's property would constitute a trespass and whether PCSR must obtain an easement or condemn and pay just compensation to landowners in connection with its proposed conjunctive use project.

## II.

The Water Court determined that: (1) artificial recharge activities involving the movement of underground water into, from, or through aquifers underlying the surface lands of the Landowners would not constitute a trespass; and (2) PCSR's proposed project would not require the Landowners' consent or condemnation and the payment of just compensation under the provisions of Article XVI, sections 14 and 15, section 37–87–101(1), or the other statutes the Landowners invoke, because the project did not involve the construction of any facilities on or in the Landowners' properties. We agree with the Water Court and uphold its judgment.

We turn first to the mootness issue and then proceed to the hydrologic and legal principles that lead us to uphold the Water Court's judgment.

## A.

## MOOTNESS

The Landowners argue that the Water Court's dismissal of PCSR's application for a conditional decree for lack of water availability renders moot the property issue it raised in this appeal. In the context of an application for a conditional decree, we have previously held that a finding of lack of water availability rendered determination of the property issue moot. *See Bd. of County Comm'rs v. Crystal Creek Homeowners' Ass'n,* 14 P.3d 325, 329 (Colo.2000). In contrast to *Crystal Creek,* the property issue in the declaratory judgment action—as framed by the Landowners—is a threshold issue to the Water Court's consideration of the conditional decree application. We determine that the Landowners' claim is not moot.

When parties seek declaratory relief there must be an actual controversy. *Const. Assocs. v. N.H. Ins. Co.,* 930 P.2d 556, 561 (Colo.1996) (citing *Community Tele-Comms. Inc. v. Heather Corp.,* 677 P.2d 330, 334 (Colo.1984)). Jurisdiction exists only if the case contains a currently justiciable issue or an existing legal controversy, rather than the mere possibility of a future claim. *Heron v. City & County of Denver,* 159 Colo. 314, 316, 411 P.2d 314, 315 (1966).

Here, due to the procedural posture of this case, we examine mootness in the context of declaratory judgments. The Uniform Declaratory Judgments Law (UDJL) is designed to "settle and afford relief from uncertainty and insecurity with respect to *rights, status, and other legal relations; and it is to be liberally construed and administered.*" § 13–51–102, 5 C.R.S. (2001) (emphasis added). The UDJL also establishes who may obtain a declaratory judgment, and under what circumstances:

Any person interested under a deed, will, written contract, or other writings constituting a contract *or whose rights, status, or other legal relations are affected by a statute,* municipal ordinance, contract, or franchise may have determined any ques-

4. PCSR filed its notice of appeal on December 27, 2001. *See* Case No. 01SA412.

tion of construction or validity arising under the instrument, statute, ordinance, contract, or franchise and obtain a declaration of rights, status, or other legal relations thereunder.

§ 13-52-106, 5 C.R.S. (2001) (emphasis added); *see also* C.R.C.P. 57(a), (b). A court may refuse to render or enter a declaratory judgment or decree where such judgment or decree, if rendered or entered, would not terminate the uncertainty or controversy giving rise to the proceeding. § 13-51-110, 5 C.R.S. (2001); C.R.C.P. 57(f).

The Landowners brought this declaratory judgment action inserting the resolution of the property issue as a prerequisite determination to the merits of a conditional decree application and that PCSR should not proceed with its application unless and until the court resolved the property issues they raised. We have previously examined whether an applicant must establish that it has or can obtain the right to use land as a prerequisite to obtaining a conditional decree, as part of the "can and will" test. This requirement is established in our case law. *See Gibbs v. Wolf Land Co.*, 856 P.2d 798 (Colo.1993); *FWS Land & Cattle Co. v. Colo.*, 795 P.2d 837 (Colo.1990); *Bubb v. Christensen*, 200 Colo. 21, 610 P.2d 1343 (1980).

In *FWS*, the water court examined whether the applicant could establish its right to use certain state lands for a reservoir enlargement project. *FWS*, 795 P.2d at 838. Finding that it could not, the court dismissed the application. *Id.* On appeal, FWS contended, among other arguments, that the water court erred by requiring a showing of land ownership as a prerequisite to obtaining a decree for a conditional water right. *Id.* We held that the ownership of land and the applicant's right of access to an existing surface reservoir for its enlargement are appropriate elements to be considered in the conditional decree process. We held that the water court "properly considered FWS's ability to use the state lands for increasing storage purposes." *Id.* at 840.

In *Gibbs*, we stated that, prior to issuing a conditional decree, the water court was required to consider the question of whether the applicant, Gibbs, could legally gain access to the parcels of property that were necessary for the withdrawal and transport of water. *Gibbs*, 856 P.2d at 801 (stating that *"prior to issuing a conditional decree*, the water court was required to consider the question of whether Gibbs could legally gain access to the parcels of property that are necessary to withdraw and transport the Intex well water") (emphasis added). The Water Court determined that Gibbs could obtain the requisite interest by condemnation in the future.

Addressing and resolving property issues that opponents to a water court application raise as a threshold issue is clearly established in our case law as part of the conditional decree process. The present case differs from *Crystal Creek*, where we determined that unappropriated water was not available to the applicant and then held moot the property ownership issue. *See Crystal Creek*, 14 P.3d at 329, 344. Here, the Water Court correctly issued its declaratory judgment ruling as a predicate to proceeding to the merits of PCSR's conditional decree application, because PCSR's right to obtain a water use right for underground storage was at issue.[5]

In sum, because the declaratory judgment act is to be liberally construed; because resolution of property ownership issues affecting water use rights is established in our case law as a proper matter for water court determination; and because PCSR has stated that, whatever action we might take with respect to its pending conditional decree application appeal, it intends to rejoin the property ownership issue by re-filing its application, we find that the case before us is not moot.[6]

---

5. If we were to agree with the Landowners' contention in the case before us that consent is required for PCSR to proceed with its application, this could render moot PCSR's appeal of the Water Court's denial of its conditional decree application.

6. PCSR has been before this Court previously in pursuit of this project, *see Park County Sportsmen's Ranch v. Bargas*, 986 P.2d 262, 264 (Colo. 1999), and has collaborated with the United States Geologic Survey to assess hydrologic and water quality data for the South Park Basin. *See Hydrologic and Water Quality Data for Surface*

## B.

## LANDOWNERS' TRESPASS CLAIM

Reacting to PCSR's Water Court application, the Landowners broadly framed their declaratory judgment claim for relief as follows:

Pursuant to C.R.C.P. 57, this Court should declare that defendant has no right to occupy the space beneath the lands of the Plaintiffs to store water or other substances on or below the surface of the lands. Any such placement or storage of water on or below the surface constitutes a trespass for which the Defendant may be liable for damages.

As the Water Court ascertained, the Landowners thus claimed that the movement of artificially recharged water into, from, and through portions of an aquifer extending under the surface of their lands as a result of PCSR's proposed project would constitute a trespass. The Water Court held it would not.

On appeal, the Landowners take no exception to the passage of augmentation water through the aquifers underlying their lands. They also concede that PCSR's proposed project does not involve the construction of any facilities on or within their properties. However, they contend that use of the aquifers for "storage" of PCSR's artificially recharged water within their properties would constitute a trespass.[7] This novel proposition has attracted several amicus briefs arguing that artificial recharge, augmentation, and storage of water in aquifers are authorized by Colorado law and do not require the consent of overlying landowners, unless the project facilities are located on or within the overlying landowners' properties.

To support their theory, the Landowners invoke our decisions in *Walpole v. State Board of Land Commissioners*, 62 Colo. 554, 163 P. 848 (1917) and *Wolfley v. Lebanon Mining Co.*, 4 Colo. 112 (1878). The Landowners invoke *Walpole* and *Wolfley* for the assertion that their "fee ownership includes the space underneath the land" and therefore they have a right to withhold consent and require compensation for PCSR's project.[8] In *Walpole*, we invalidated a State Land Board mineral reservation the Board had made in the course of selling and conveying title to a parcel of school trust land property. In holding under the law existing at that time that the Board had authority only to convey the entire fee interest, we said:

Land has an indefinite extent upward and downward from the surface of earth, and therefore includes whatever may be erected upon it, and whatever may lie in a direct line between the surface and the center of the earth.

*Walpole*, 62 Colo. at 557, 163 P. at 849–50. In *Wolfley*, we said: "At common law a grant of land carries with it all that lies beneath

*Water, Ground Water, and Springs in North–Central Park County, Colorado, April 1997–November 1998*, U.S. Geological Survey, Open–File Report 99–183 (1999). It already has in place structures for recharging the aquifer.

**7.** The Landowners state in their Opening Brief: The Landowners agree that the recharge and movement of water in an aquifer might not constitute a trespass. However, when an applicant seeks to store and hold water pursuant to a storage decree on or under lands that it does not own, it must obtain consent or an interest in the reservoir lands. The Water Court's failure to recognize this distinction caused the error in its ruling. The distinction between an underground storage right, in which water is held in place and is not subject to appropriation, as opposed to an augmentation plan involving the recharge and movement of water through an aquifer to a surface stream to replace depletions, is key to resolving this appeal, and mandates reversal of the Water Court's ruling.

**8.** In their complaint for declaratory relief, the Landowners state:

Plaintiffs own land within the project or storage area proposed by Defendant and they request a declaration of this Court that as owners of the land, they own and have the right to control the storage space under the surface of their lands. As such, water cannot be stored above or below the surface of their lands without the granting of an easement or other form of consent, or through acquisition by eminent domain, if available. Plaintiffs also request a declaration of this Court that, absent consent of the landowner or an eminent domain award, the storage of water on their lands, either above or below the surface, would constitute a trespass for which the Defendant would be subject to damages.

the surface down to the center of the earth." *Wolfley,* 4 Colo. at 114.

The Water Court found that "Plaintiffs have not alleged that their use, benefit and enjoyment of the estate will be invaded or compromised in any way." The Landowners simply assert that common-law principles entitle them to control the storage space in aquifers underneath the surface of their lands and grant them a remedy in trespass against migration of PCSR's water laterally into their property. The Ohio Supreme Court has rejected a very similar contention in *Chance v. BP Chemicals, Inc.,* 77 Ohio St.3d 17, 670 N.E.2d 985 (1996). In that case, a property owner claimed that the migration of injected liquid into portions of a very deep aquifer underlying its property constituted a trespass. Determining that the injectate mixed with "waters of the state" in the aquifer, the Ohio Supreme Court rejected the property owner's claim of ownership and trespass based on the cujus doctrine. It stated:

> Our analysis above concerning the native brine illustrates that appellants do not enjoy absolute ownership of waters of the state below their properties, and therefore underscores that their subsurface ownership rights are limited. As the discussion in *Willoughby Hills*[9] makes evident, ownership rights in today's world are not so clear-cut as they were before the advent of airplanes and injection wells.
>
> Consequently, we do not accept appellants' assertion of absolute ownership of everything below the surface of their properties. Just as a property owner must accept some limitations on the ownership rights extending above the surface of the property, we find that there are also limitations on property owners' subsurface rights. We therefore extend the reasoning of *Willoughby Hills,* that absolute ownership of air rights is a doctrine which "has no place in the modern world," to apply as well to ownership of subsurface rights.

*Chance,* 670 N.E.2d at 992.

We find the Ohio Supreme Court's discussion of state waters and limitations upon absolute subsurface ownership rights to be of particular significance to the case before us, in light of Colorado's strong constitutional, statutory, and case law holding all water in Colorado to be a public resource and allowing holders of water rights decrees the right of passage for their appropriated water through and within the natural surface and subsurface water-bearing formations. The Arizona Court of Appeals has rejected a claim of property ownership rights very similar to the Landowners' claim in this case. *See W. Maricopa Combine, Inc. v. Ariz. Dep't of Water Resources,* 200 Ariz. 400, 26 P.3d 1171, 1176 (App.2001); *see also Los Angeles v. San Fernando,* 14 Cal.3d 199, 263–64, 123 Cal.Rptr. 1, 537 P.2d 1250, 1297 (1975) (recognizing ground water storage by artificial recharge and stating that the "fact that spread water is commingled with other ground water is no obstacle to the right to recapture the amount by which the available conglomerated ground supply has been augmented by the spreading.")

Thus, we turn to Colorado law, focusing first on the hydrologic principles involving tributary aquifers and the General Assembly's authorization of conjunctive use projects involving artificial recharge, augmentation, and underground storage in aquifers.

## C.

### TRIBUTARY AQUIFER HYDROLOGY

Legislators, administrators, and judges generally have a better understanding of surface water systems than ground water systems. *See* Robert Jerome Glennon & Thomas Maddock, *The Concept of Capture: The Hydrology and Law of Stream/Aquifer Interactions,* Forty–Third Annual Rocky Mountain Mineral Law Institute § 22.02, at 22–7 (1997). Some states that allocate their surface water by the principles of prior appropriation nevertheless allocate ground water by a rule of capture that permits overlying

---

9. *See Willoughby Hills v. Corrigan,* 29 Ohio St.2d 39, 278 N.E.2d 658, 664 (1972) (stating that "the doctrine of the common law, that the ownership of land extends to the periphery of the universe, has no place in the modern world") (citing *United States v. Causby,* 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946)).

landowners to possess the ground water appearing under their land without regard to the effect of its extraction upon other ground water and surface water users. However, such a rule of capture defies hydrologic reality [10] and impairs the security and reliability of senior water use rights that depend on an interconnected ground and surface water system. Colorado law contains a presumption that all ground water is tributary to the surface stream unless proved or provided by statute otherwise.[11] *Safranek v. Town of Limon*, 123 Colo. 330, 334, 228 P.2d 975, 977 (1951).

An aquifer is a subsurface water bearing formation. Hydrologic continuity exists if there is a hydrologic connection between a surface stream and the water table of an aquifer. Glennon & Maddock, *supra*, at 22–7 to 22–8. The water moves through a shared, permeable layer. Ground water, in an interconnected hydrologic system, provides a base flow [12] for surface streams through the saturated layer of the water bearing formation. Water added to a ground water system can increase the flow of the surface stream; conversely, well pumping that results in lowering the water table can deplete the surface stream.

Aquifers consist of unsaturated and saturated zones. The unsaturated zone contains both air and water in the spaces between the grains of sand, gravel, silt, clay, and cracks within the rock. *See Ground Water and Surface Water, A Single Resource*, U.S. Geological Survey Circular 1139, at 6 (1999) [hereinafter *USGS* ]. The movement of water in the unsaturated zone above the water table is controlled by gravity and capillary forces. Georg Matthess, *The Properties of Groundwater* 173 (1982). In the saturated zone, these voids are completely filled with water. *USGS* at 6. The upper surface of the saturated zone is the water table. *Id.* Water that infiltrates the land surface moves vertically downward through unsaturated areas to the water table to become ground water. Once the water has infiltrated the soil, its passage downward to join the ground water depends on the geologic structures and rock composition. *See* Elizabeth M. Shaw, *Hydrology in Practice* 124 (2d. ed.1989). Storativity can be calculated for confined and unconfined aquifers. *Id.* at 128. The ground water typically moves laterally within the ground water system. *USGS* at 7. Well pumping creates a cone of depression, with the point of the inverted cone occurring at the bottom of the well pipe. This causes surrounding water in the aquifer to flow into the cone from all sides. *See Fellhauer v. People*, 167 Colo. 320, 331, 447 P.2d 986, 992 (1968).

The interaction between streams and tributary aquifers occurs in three basic ways: streams gain water from inflow of ground water into the surface stream, streams lose water to the aquifer from outflow from the stream, or do both by gaining water from aquifers in some reaches and losing it to aquifers in other reaches. *USGS* at 9. Without human intervention, the surface/ground water interconnected system "exists in a state of approximate equilibrium" which implies "a long-term balance between natural recharge and discharge processes in a groundwater basin." Glennon & Maddock, *supra*, at 22–10.

"Recharge," whether natural or artificial, is "the accretion of water to the upper surface of the saturated zone." *USGS* at 6. "Discharge" is the contribution of aquifer water that migrates to the surface. *Id.*

---

10. This is a common sentiment expressed by legal commentators. One article states:

> The law in many states has not kept pace with the advances in the science of hydrology. Many states have developed entirely separate systems for regulating ground and surface water, even though there are often physical connections between the two and capture processes are occurring. The consequence is a set of legal rules that fails to conform to physical reality.

Glennon & Maddock, *supra*, § 22.02, at 22–14.

11. Pursuant to Colorado law, designated ground water, non-tributary ground water, and Denver Basin ground water are allocated and administered under a system that differs from the allocation and administration of the natural stream system. *See generally Upper Black Squirrel Creek Ground Water Mgmt. Dist. v. Goss*, 993 P.2d 1177 (Colo.2000).

12. Base flow is "the slow time response component of streamflow." Glennon & Maddock, *supra*, at 22–7.

"Storage" is the retention of ground water in the aquifer for a temporal period. The length of the retention time depends upon the specific characteristics of the aquifer:

Aquifers have two main functions in the underground phase of the water cycle. They store water for varying periods in the underground reservoir, and they act as pathways or conduits to pass water along through the reservoir. Although some are more efficient as pipelines (e.g., cavernous limestones) and some are more effective as storage reservoirs (e.g., sandstones), most aquifers perform both functions continuously.

John C. Manning, *Applied Principles of Hydrology* 156 (1987). Hydrologists and commentators refer to the entire zone of saturation as a "groundwater reservoir":

While the entire zone of saturation is referred to as the *groundwater reservoir*, it is seldom a single, homogeneous geologic formation. Usually a variety of rock types are present at any given location, and even though they may all be saturated, they often have widely varying hydrologic properties. Some would be called aquifers and others would not. The term aquifer comes from two latin words *aqua*, meaning water, and *ferre*, to bear.

To be called an aquifer, a geologic formation must be porous and permeable. It must store, transmit, and yield significant amounts of water to springs and wells.

*Id.* at 148 (emphasis in original).

The extent of underground storage available for artificial recharge without interfering with the aquifer's natural recharge capacity or injuring senior ground or surface water rights is a central issue in any proposal to use an aquifer for artificial recharge and storage. *See* Ella Foley-Gannon, *Institutional Arrangements for Conjunctive Water Management in California and Analysis of Legal Reform Alternatives*, 6 Hastings W.-Nw. J. Envtl. L. & Pol'y 273, 274–75 (2000).

Because the physical characteristics of groundwater basins vary greatly, the suitability of a particular basin to serve as an area for immediate storage and later extraction depends on its hydrological and

geological features, as well as on the quality of the water stored within the basin. *Id.* at 277. Some aquifers may be more suitable for storage of artificially recharged water than others. *Id.* at 278–79.

Whether a particular aquifer can accommodate a proposed conjunctive use project is a factor to consider in a Water Court decree application in Colorado and the determination will turn upon the facts of the case. The merits of PCSR's extraction, recharge, augmentation, and storage proposal are not before us. However, resolution of the Landowners' trespass claim against PCSR's proposed use of the aquifers underneath the surface of their properties is before us. The aquifers PCSR proposes to utilize extend under approximately 115 square miles of land in South Park.

Under the Landowners' property ownership theory, each landowner would have a cause of action against PCSR or any other person attempting to pursue a conditional water rights application for storage of water in the aquifer. However, we determine that the General Assembly, in authorizing the use of aquifers for storage of artificially recharged waters pursuant to decreed conjunctive use projects, has further supplanted the Landowners' common-law property ownership theory.

■ Conjunctive use projects are water projects that employ the natural water bearing formations—on the land's surface and in the aquifers—in the exercise of decreed water use rights according to their priority vis-à-vis all other decreed water rights. We now discuss the General Assembly's authorization for such projects.

D.

STATUTORY AUTHORIZATION FOR
CONJUNCTIVE USE PROJECTS

■ When parties have use rights to water they have captured, possessed, and controlled, they may place that water into an aquifer by artificial recharge and enjoy the benefit of that water as part of their decreed water use rights, if the aquifer can accommo-

date the recharged water without injury to decreed senior water rights.

■ This authority resides in a number of statutory sections that implement the "Colorado Doctrine," which is that all water in the state is a public resource dedicated to the beneficial use of public and private agencies, as prescribed by law. *See Chatfield E. Well Co. v. Chatfield E. Prop. Owners Ass'n*, 956 P.2d 1260, 1268 (Colo.1998).

Sections 37–92–305(9)(b) [13] and (c) [14] provide that the Water Court may issue a conditional decree for storage of water in underground aquifers if the applicant can and will lawfully capture, possess, and control water for beneficial use which it then artificially recharges into the aquifer. Section 37–87–101(1) [15] provides that the right to store water of a natural stream is a right of appropriation in order of priority, and section 37–87–101(2) [16] provides that underground aquifers can be used for storage of water that the applicant artificially recharges into the aquifer pursuant to a decreed right.

The storage definition of section 37–92–103(10.5), 10 C.R.S. (2001), contains a two-part definition. The statute provides:

"Storage" or "store" means the impoundment, possession, and control of water by means of a dam. Waters in underground aquifers are not in storage or stored *except to the extent waters in such aquifers are placed there by other than natural means with water to which the person placing such water in the underground aquifer has a conditional or decreed right.*

*Id.* (emphasis added). The first part defines "storage" as the impoundment, possession, and control of water by means of a dam and describes the typical reservoir, which is a constructed impoundment. The second definition contemplates the artificial recharge of water into the aquifer for "storage" and describes the circumstances under which a decree may be issued for aquifer storage. Thus, the legislature contemplated a two-step process: that a person will capture, possess, and control water and then artificially recharge it into the aquifer for storage and subsequent use, pursuant to a decreed water right. [17]

The General Assembly's authorization for conjunctive use projects implements basic tenets of Colorado water law that the legislature has clearly enunciated: (1) a natural stream consists of all underflow and tributary waters, § 37–92–102(1), 10 C.R.S. (2001); (2) all waters of the natural stream are subject to appropriation, adjudication, and administration in the order of their decreed priority, § 37–92–102(1)(a) & (b); (3)

**13.** Section 37–92–305(9)(b), 10 C.R.S. (2001), provides that:

No claim for a conditional water right may be recognized or a decree therefor granted except to the extent that it is established that the waters can be and will be diverted, stored, or otherwise captured, possessed, and controlled and will be beneficially used and that the project can and will be completed with diligence and within a reasonable time.

**14.** Section 37–92–305(9)(c), 10 C.R.S. (2001), provides that:

No water right or conditional water *right for the storage of water in underground aquifers* shall be recognized or decreed except to the extent water in such an aquifer has been placed there by other than natural means by a person having a conditional or decreed right to such water.
(Emphasis added.)

**15.** Section 37–87–101(1), 10 C.R.S. (2001), provides that:

The right to store water of a natural stream for later application to beneficial use is recognized as a right of appropriation in order of priority

under the Colorado constitution. No water storage facility may be operated in such a manner as to cause material injury to the senior appropriative rights of others. Acquisition of those interests in real property reasonably necessary for the construction, maintenance, or operation of any water storage reservoir, together with inlet, outlet, or spillway structures or other facilities necessary to make such reservoir effective to accomplish the beneficial use or uses of water stored or to be stored therein, may be secured under the laws of eminent domain.

**16.** Section 37–87–101(2), 10 C.R.S. (2001), provides that:

Underground aquifers are not reservoirs within the meaning of this section *except to the extent such aquifers are filled by other than natural means with water to which the person filling such aquifer has a conditional or decreed right.*
(Emphasis added.)

**17.** Section 37–92–301(3)(d) favors the recharge and replenishment of ground water resources.

the policy of the state is to integrate the appropriation, use, and administration of underground water tributary to a stream with the use of surface water in such a way as to maximize the beneficial use of all of the waters of the state, § 37–92–102(2); and (4) the conjunctive use of ground and surface water shall be recognized to the fullest extent possible, subject to the preservation of other existing vested rights in accordance with the law. § 37–92–102(2)(b).[18]

Other Colorado statutes foster ground water recharge and storage. *See, e.g.,* § 35–70–103(6)(a), 10 C.R.S. (2001) (stating that one of the duties assigned to the state soil conservation board is to develop underground water storage projects). The General Assembly has attributed the statewide problem of soil loss and loss of irrigable acreage to a lack of aquifer recharge. *See, e.g.,* § 35–70–102, 10 C.R.S. (2001) (stating that loss of irrigable and agricultural acreage in Colorado is a result of, among other problems, "increasing the rate of withdrawal from underground water reserves without adequate attention to recharging such reserves"); *see also* § 37–92–301(3)(d), 10 C.R.S. (2001). Another statute encourages the erection of suitable structures and the maintaining of facilities "to increase underground storage reserves." § 35–70–103(6)(g), 10 C.R.S. (2001).

 Construing the General Assembly's wording and intent and effectuating evident legislative purposes, we determine that the General Assembly has authorized the issu-

ance of decrees for artificial recharge and storage of water in an aquifer when the decree holder lawfully captures, possesses, and controls water and then places it into the aquifer for subsequent beneficial use. The applicant bears the burden of demonstrating that the aquifer is capable of being utilized for the recharge and storage of the applicant's water without impairment to the decreed water rights of senior surface or ground water users who depend upon the aquifer for supply.[19]

We now turn to water use rights and property ownership rights under Colorado law.

### E.

### WATER USE RIGHTS AND LAND OWNERSHIP RIGHTS UNDER COLORADO LAW

Colorado law differs fundamentally from the English common law it replaced. The English case of *Acton v. Blundell,* 12 Mees. & W. 324, 152 Eng. Rep. 1223 (1843) set forth the common-law rule of surface streams and ground water, based on Roman precedent. Enjoyment of the flowing surface stream was a riparian right of property owners whose land abutted the stream:

> The rule of law which governs the enjoyment of a stream flowing in its natural course over the surface of land belonging to different proprietors is well established; each proprietor of the land has a right to

---

18. Storage of water underground in connection with conjunctive use projects has a number of advantages that implement the legislature's purpose to maximize the beneficial use of all of the state's waters. For example, water stored underground is not lost to evaporation; the water can be used as an emergency supply in the event of disruption to surface water systems; storing water in an aquifer raises the water table and can reduce energy demand and energy costs otherwise needed for well pumping; and storing water underground helps to reduce committing additional surface land to additional large reservoirs, conveyance systems, and stream modifications. Foley–Gannon, *supra,* at 275.

19. Based upon the principles of Colorado law embodied in the statutes and our case law, the applicant would have to meet conditions to utilize an aquifer for storage of artificially recharged water. The applicant, at least: (1) must capture, possess, and control the water it intends

to put into the aquifer; (2) must not injure other water use rights, either surface or underground, by appropriating the water for recharge; (3) must not injure water use rights, either surface or underground, as a result of recharging the aquifer and storing water in it; (4) must show that the aquifer is capable of accommodating the stored water without injuring other water use rights; (5) must show that the storage will not tortiously interfere with overlying landowners' use and enjoyment of their property; (6) must not physically invade the property of another by activities such as directional drilling, or occupancy by recharge structures or extraction wells, without proceeding under the procedures for eminent domain; (7) must have the intent and ability to recapture and use the stored water; and (8) must have an accurate means for measuring and accounting for the water stored and extracted from storage in the aquifer.

the advantage of the stream flowing in its natural course over his land, to use the same as he pleases, for any purposes of his own, not inconsistent with a similar right in the proprietors of the land above or below; so that, neither can any proprietor above diminish the quantity or injure the quality of the water which would otherwise naturally descend, nor can any proprietor below throw back the water without the license for the grant of the proprietor above.

*Acton*, 12 Mees. & W. at 348–49, 152 Eng. Rep. at 1233. In contrast to the surface stream, so the court declared, ground water moves "through the hidden veins of the earth beneath its surface; no man can tell what changes these underground sources have undergone in the progress of time." *Id.* at 350, 152 Eng. Rep. at 1233. The court then held that ground water was not governed by the law that applies to rivers and flowing streams; rather, it was subject to the cujus doctrine. The court asserted that ground water:

> falls within that principle, which gives to the owner of the soil all that lies beneath his surface; that the land immediately below is his property, whether it is solid rock, or porous ground, or venous earth, or part soil, part water; that the person who owns the surface may dig therein, and apply all that is there found to his own purposes at his free will and pleasure; and that if, in the exercise of such right, he intercepts or drains off the water collected from underground springs in his neighbour's well, this inconvenience to his neighbour falls within the description of damnum absque injuria, which cannot become the ground of an action.

*Id.* at 354, 152 Eng. Rep. at 1235; *see also Roath v. Driscoll*, 20 Conn. 533, 541 (1850).

Advancing the national agenda of settling the public domain required abandonment of the pre-existing common-law rules of property ownership in regard to water and water use rights.[20] Reducing the public land and water to possession and ownership was a preoccupation of territorial and state law from the outset.[21] A new law of custom and usage in regard to water use rights and land ownership rights, the "Colorado Doctrine," arose from "imperative necessity" in the western region. This new doctrine established that: (1) water is a public resource, dedicated to the beneficial use of public agencies and private persons wherever they might make beneficial use of the water under use rights established as prescribed by law; (2) the right of water use includes the right to cross the lands of others to place water into, occupy and convey water through, and withdraw water from the natural water bearing formations within the state in the exercise of a water use right; and (3) the natural water bearing formations may be used for the transport and retention of appropriated water. This new common law established a property-rights-based allocation and administration system which promotes multiple use of a finite resource for beneficial purposes. *Empire Lodge Homeowners' Ass'n v. Moyer*, 39 P.3d 1139, 1146–47 (Colo.2001).

When first announcing the Colorado Doctrine, we said that "rules respecting the tenure of private property must yield to the physical laws of nature, whenever such laws exert a controlling influence." *Yunker v. Nichols*, 1 Colo. 551, 553 (1872) (Hallett, C.J.).

> When the lands of this territory were derived from the general government, they were subject to the law of nature, which holds them barren until awakened to fertility by nourishing streams of water, and the purchasers could have no benefit from the

20. Congress carved the Western states from property of the United States acquired through the 1803 Louisiana Purchase, the 1846 Oregon Compromise, and the 1848 Treaty of Guadalupe Hidalgo. Loren L. Mall, *Public Land and Mining Law* 7–8 (3d ed.1981).

21. For example, Colorado defined "any right to occupy, possess and enjoy any portion of the public domain" as "a chattel real *possessing the*

*legal character of real estate."* Act of November 7, 1861, § 1, 1861 Colo. Sess. Laws 168, 168; § 36–2–101, 10 C.R.S. (2001). This was a departure from the common-law concept of "naked possession" that the Colorado Supreme Court termed "remarkable." *Gillett v. Gaffney*, 3 Colo. 351, 358 (1877); *see Bd. of County Comm'rs v. Vail Assocs.*, 19 P.3d 1263, 1269 n. 8 (Colo.2001).

grant without the right to irrigate them. It may be said, that all lands are held in subordination to the dominant right of others, who must necessarily pass over them to obtain a supply of water to irrigate their own lands, and this servitude arises, not by grant, but by operation of law.

*Yunker,* 1 Colo. at 555. Commenting on the 1861 Territorial Act, Justice Wells, in *Yunker,* confirmed this principle:

> I conceive that, with us, the right of every proprietor to have a way over the lands intervening between his possessions and the neighboring stream for the passage of water for the irrigation of so much of his land as may be actually cultivated, is well sustained by force of the necessity arising from local peculiarities of climate.... But it appears to me that this right must rest altogether upon the necessity rather than upon the grant which the statute assumes to make....
>
> It seems to me, therefore, that the right springs out of the necessity, and existed before the statute was enacted, and would still survive though the statute were repealed.

*Id.* at 570 (Wells, J., concurring).[22]

We followed *Yunker*'s lead with *Coffin v. Left Hand Ditch Co.,* 6 Colo. 443 (1882), holding that an appropriator could capture water from a stream and transport it to another watershed, using streams in both watersheds to convey the appropriated water to its place of beneficial use:

> The doctrine of priority of right by priority of appropriation for agriculture is evoked, as we have seen, by the imperative necessity for artificial irrigation of the soil.[23] And it would be an ungenerous and inequitable rule that would deprive one of its benefit simply because he has, by large expenditure of time and money, carried the water from one stream over an intervening

watershed and cultivated land in the valley of another.

*Coffin,* 6 Colo. at 449.

■ Accordingly, by reason of Colorado's constitution, statutes, and case precedent, neither surface water, nor ground water, nor the use rights thereto, nor the water-bearing capacity of natural formations belong to a landowner as a stick in the property rights bundle. Section 37–87–103, 10 C.R.S. (2001), for example, codifies this longstanding aspect of the Colorado Doctrine. It provides that water appropriated by means of a reservoir impoundment and then released for travel to its place of beneficial use shall enjoy the right of passage through the natural formation in the administration of water use rights.

In *State v. Southwestern Colorado Water Conservation District,* we cited the McCarran Amendment's Senate Report in support of the state's authority to depart from the preexisting common law in enunciating the principles of the Colorado Doctrine:

> [I]n the arid Western States, for more than 80 years, the law has been that the water above and beneath the surface of the ground *belongs to the public,* and the right to the use thereof is to be acquired from the State in which it is found, which State is vested with the primary control thereof.

*State v. Southwestern Colo. Water Conservation Dist.,* 671 P.2d 1294, 1307 (Colo.1983) (emphasis added); *see also Roaring Fork Club, L.P. v. St. Jude's Co.,* 36 P.3d 1229, 1231–32 (Colo.2001) (stating that "as early as the tenure of the territorial legislature, our lawmakers recognized that our arid climate required the creation of a right to appropriate and convey water across the land of another so that lands not immediately proximate to water could be used and developed"); *Safranek v. Town of Limon,* 123 Colo. 330, 336, 228 P.2d 975, 978 (1951) (stating that "[w]e have long since departed from the English common-law doctrine of ownership of

**22.** Commentators have noted the striking departure from the common-law riparian and cujus doctrines for surface and ground water which Colorado effectuated in contrast to the rule enunciated in *Acton v. Blundell,* 12 Mees. & W. 324, 152 Eng. Rep. 1223 (1843). *See* Charles E. Corker, *Groundwater Law, Management and Administration* 103 (National Water Commission October

1971); A. Dan Tarlock, *Law of Water Rights and Resources* § 3.3, at 3–4 to 3–6; § 4.6, at 4–6; § 5.8, at 5–12 to 5–14 (West 2001).

**23.** In 1903, Colorado extended its adjudication law to all beneficial uses. *Empire Lodge,* 39 P.3d at 1149.

percolating waters by the surface owner"); *Southwestern*, 671 P.2d at 1316 (overruling *Whitten v. Coit*, 153 Colo. 157, 385 P.2d 131 (1963), to the extent that *Whitten* had been previously understood to recognize in a landowner an interest in nontributary water coextensive with right of ownership of other interests in real property); *Colo. River Water Conservation Dist. v. Colo. Water Conservation Bd.*, 197 Colo. 469, 474, 594 P.2d 570, 573 (1979) (stating that Colorado abolished the riparian water law doctrine).

## F.

### ACCOMMODATION OF WATER USE RIGHTS AND LAND OWNERSHIP RIGHTS

Upon adoption of Colorado's constitution, the state struck an accommodation between two kinds of property interests—water use rights and land rights—by requiring the owners of water use rights to obtain the consent of, or pay just compensation to, owners of land in, upon, or across which the water right holders constructed dams, reservoirs, ditches, canals, flumes, or other manmade facilities for the diversion, conveyance, or storage of water.[24] *See* Colo. Const. art. XVI, § 7; Colo. Const. art. II, §§ 14 & 15; § 37–86–102, 10 C.R.S. (2001).

■■■ But, this requirement does not extend to vesting in landowners the right to prevent access to the water source or require compensation for the water use right holder's employment of the natural water bearing surface and subsurface formations on or within the landowners' properties for the movement of its appropriated water. Our decision in *Southwestern*, reaffirming the

Colorado Doctrine, is adverse to the Landowners' property right and just compensation claims in this regard.[25]

We addressed in *Southwestern* the federal laws which: (1) effectuated a severance of water from the land patents issuing out of the public domain; (2) confirmed the right of the states and territories to recognize rights to water established prior to the federal acts; and (3) granted the right to states and territories to legislate in regard to water and water use rights:

> The 1866[26] and 1870[27] Acts were not limited to confirmation of appropriative water rights acquired prior to 1866, but "[t]hey reach into the future as well, and approve and confirm the policy of appropriation for a beneficial use, as recognized by local rules and customs, and the legislation and judicial decisions of the arid-land states, as the test and measure of private rights in and to the non-navigable waters of the public domain." *California Oregon Power Co. [v. Beaver Portland Cement Co.]*, 295 U.S. [142] at 155, 55 S.Ct. [725] at 728 [79 L.Ed. 1356 (1935)]. The Desert Land Act of 1877[28] made the application of the policy to future appropriations even more explicit. *California Oregon Power Co.*, 295 U.S. at 155–156, 55 S.Ct. at 728.

*Southwestern*, 671 P.2d at 1305–06.

Of particular significance to the case before us, we held in *Southwestern* that: (1) federal patents to land did not include water, *id.* at 1306; (2) ground water is not a mineral under the federal mining laws or Colorado law, *id.*; (3) federal statutes as interpreted by the United States Supreme Court recognize Colorado's authority to adopt its own system for the use of all waters within the

---

24. Our cases variously describe the occupancy of another person's land for the construction and operation of water works facilities as a right of way, irrevocable license, servitude, or easement. *See Graybill v. Corlett*, 60 Colo. 551, 553, 154 P. 730, 731 (1916); *Knudson v. Frost*, 56 Colo. 530, 531, 139 P. 533, 533 (1914); *Arthur Irrigation Co. v. Strayer*, 50 Colo. 371, 374–75, 115 P. 724, 725 (1911).

25. A commentator has described Justice Lohr's opinion in *Southwestern* as one of two "leading modern statements of the Colorado rule," the other being Justice Erickson's decision in *United*

*States v. City & County of Denver*, 656 P.2d 1 (Colo.1982). Tarlock, *supra*, § 5:8, at 5–12 n. 2.

26. Act of July 26, 1866, ch. 262, § 9, 14 Stat. 251 (codified as amended at 30 U.S.C. §§ 21 to 54 (1976)).

27. Act of July 9, 1870, ch. 235, § 17, 16 Stat. 217, 218 (codified as amended at 30 U.S.C. § 52 (1976)).

28. Act of March 3, 1877, ch. 107, 19 Stat. 377 (codified as amended at 43 U.S.C. §§ 321–329 (1976)).

state in accordance with the needs of its citizens, subject to the prohibitions against interference with federal reserved rights, with interstate commerce, and with the navigability of any navigable waters, *id.* at 1307; (4) the right of prior appropriation applies under Colorado law to waters of the natural stream, including surface water and tributary ground water, *id.* at 1308; (5) the property rights of landowners do not include the right to control the use of water in the ground, whatever the character of that water, *id.* at 1316; and (6) the General Assembly has plenary control over the use and disposition of ground water that is not part of the natural stream. *Id.* at 1317–18; *see also Andrus v. Charlestone Stone Prods.*, 436 U.S. 604, 615, 98 S.Ct. 2002, 56 L.Ed.2d 570 (1978) (stating that "[u]nder the appropriation doctrine prevailing in most of the Western States, the mere fact that a person controls land adjacent to a body of water means relatively little").

Despite our holding in *Southwestern,* the Landowners claim a common-law property right to require consent or just compensation for an easement to use the subsurface estate for artificial recharge and storage of water in aquifers extending through their properties, asserting that "fee ownership includes the space underneath the land" which the water occupies. The Landowners rely on *Walpole* and *Wolfley* for this proposition, but these are mineral cases which are clearly distinguishable from water cases, as we held in *Southwestern.*

■ In deference to the laws of nature, which we held to be foundational in *Yunker v. Nichols,* Colorado law does not recognize a land ownership right by which the Landowners can claim control of the aquifers as part of their bundle of sticks. To the contrary, "[a]s knowledge of the science of hydrology advanced, it became clear that natural streams are surface manifestations of extensive tributary systems, including underground water in stream basins," *Three Bells*

*Ranch Assocs. v. Cache La Poudre Water Users Ass'n,* 758 P.2d 164, 170 (Colo.1988), and passage of appropriated water through the natural streams is part of the Colorado law of water use rights.

■ However, Article XVI, section 7 does subject the construction of artificial water facilities on another's land to the payment of just compensation and grants a right of private condemnation for the construction of such waterworks:

> All persons and corporations shall have the right of way across public, private and corporate lands for the construction of ditches, canals and flumes for the purpose of conveying water for domestic purposes, for the irrigation of agricultural lands, and for mining and manufacturing purposes, and for drainage, upon payment of just compensation.

Colo. Const. art. XVI, § 7. Contrary to the Landowners' argument that use of their subsurface estate is different from use of their surface estate—over which appropriators may transport water in natural stream channels without payment of compensation [29]— Colorado holds no distinction between surface water and ground water, tributary or non-tributary, in regard to the right and ability of the holders of decreed water rights to employ the natural water bearing formations in the exercise of those rights. Colorado's common law and statutory law in this regard rests on the bedrock of: (1) the plenary authority Congress recognized in the states and territories for the establishment and exercise of water use rights; (2) the election of Congress to patent land separately from water, so that the states and territories could legislate in regard to water and water rights as they deemed fit; and (3) Colorado's choice to include all water wherever it resides or travels through the natural formations as a public resource held open

---

**29.** In *People v. Emmert,* 198 Colo. 137, 141, 597 P.2d 1025, 1027 (1979), we held that the beds of non-navigable streams in Colorado are not held by the state under a public trust theory; this holding, however, did not affect the right of appropriators to conduct their appropriated water through the natural channel across the landowner's property without interference. *See id.* at 142, 597 P.2d at 1027; *see, e.g., Bd. of County Comm'rs v. Upper Gunnison River Water Conservancy Dist.,* 838 P.2d 840, 849, 854 (Colo.1990).

and available for the establishment of use rights as prescribed by law.[30]

In sum, the holders of water use rights may employ underground as well as surface water bearing formations in the state for the placement of water into, occupation of water in, conveyance of water through, and withdrawal of water from the natural water bearing formations in the exercise of water use rights. *See Coffin*, 6 Colo. at 449; *Larimer County Reservoir Co. v. Luthe*, 8 Colo. 614, 616, 9 P. 794, 795–96 (1885) (holding that an appropriator can use the natural non-navigable stream for water storage); *People v. Emmert*, 198 Colo. 137, 142, 597 P.2d 1025, 1028 (1979) (stating that section 5 of Article XVI of the Colorado Constitution "was primarily intended to preserve the historical appropriation system of water rights upon which the irrigation economy in Colorado was founded"); *Danielson v. Vickroy*, 627 P.2d 752, 756 (Colo.1981) (stating that the purpose of the Ground Water Management Act was to permit the full economic development of designated ground water resources); *Bayou Land Co. v. Talley*, 924 P.2d 136, 146 (Colo.1996) (holding that Congress did not grant ownership of water along with land grants and the General Assembly's statutory provisions control); *Chatfield E. Well Co. v. Chatfield E. Prop. Owners Ass'n*, 956 P.2d 1260, 1268 (Colo.1998) (stating that water is a public resource and the "right to use nontri-

butary ground water outside of a designated basin is purely a function of statute and landowners do not have an absolute right to ownership of water underneath their land"); *Park County Sportsmen's Ranch v. Bargas*, 986 P.2d 262, 275 (Colo.1999) (holding that ground water beneath lands in South Park is tributary and is subject to the doctrine of prior appropriation).

We reject the Landowners' claim that the cujus doctrine provides them with a property right to require consent for artificial recharge and storage of water in aquifers that extend through their land.[31] Water is not a mineral. *See Andrus v. Charlestone Stone Prods.*, 436 U.S. at 615, 98 S.Ct. 2002. The law of minerals and property ownership we relied on in *Walpole* and *Wolfley* is inapplicable to water and water use rights.[32]

G.

## CONDEMNATION FOR CONSTRUCTED WATERWORKS

We now address the Landowners' contention that certain statutory provisions, in combination with Article II, sections 14 and 15 of the Colorado Constitution, evidence legislative intent to require consent or the payment of just compensation for the right of storage occupancy in aquifers extending through the Landowners' properties.

---

**30.** Justice Lohr emphasized that:

> When Congress elected to patent land separately from water and to allow the states to legislate in respect of waters and water rights as they deem wise in the public interest, *California Oregon Power Co.*, 295 U.S. at 163, 55 S.Ct. at 731, it made no distinction between tributary and nontributary waters.

*Southwestern*, 671 P.2d at 1319 (internal quotation marks omitted).

**31.** In section 41–1–107, 11 C.R.S. (2001), the General Assembly provided that the "ownership of space above the lands and waters of this state is declared to be vested in the several owners of the surface beneath, subject to the right of flight of aircraft." The careful phraseology of this provision states no counterpart recognition that landowners have a right to control the water bearing space of natural surface or subsurface formations extending through their property with respect to the exercise of water use rights. *See Emmert*, 198 Colo. at 140–41, 597 P.2d at 1027;

*see also* § 38–30.5–102, 10 C.R.S. (2001) (stating that a conservation easement in gross means "a right in the owner of the easement to prohibit or require a limitation upon or obligation to perform acts on or with respect to a land or water area or airspace above the land or water owned by the grantor").

**32.** We decline to extend principles of mineral law to water law in Colorado for additional reasons. Ownership of oil and gas is a private right closely tied to property ownership; it logically follows that the right to ownership, extraction, and storage of mineral resources would remain sticks in the property owner's bundle of sticks. Water is a public resource, and any rights to it are usufructuary. Mineral law is a special body of law derived from special circumstances. *See Chance v. BP Chems., Inc.*, 77 Ohio St.3d 17, 670 N.E.2d 985, 991 (1996) ("We find the situation before us is not analogous to those present in oil and gas cases, around which a special body of law has arisen based on special circumstances not present here.").

When interpreting statutes, we adopt the statutory construction that best effectuates the legislative intent and design. *Bargas*, 986 P.2d at 268. We presume that the General Assembly intended a just and reasonable result, and favored the public interest over private interests. *See* § 2–4–201(b) & (e), 1 C.R.S. (2001); *State Eng'r v. Castle Meadows, Inc.*, 856 P.2d 496, 504 (Colo.1993). We consider the language the legislature fashioned and the consequences of a particular construction. *Ingram v. Cooper*, 698 P.2d 1314, 1315 (Colo.1985). We adopt the construction that reconciles and harmonizes conflicting provisions, to the extent possible, and we study the course of a statute's enactment in doing so. *Empire Lodge*, 39 P.3d at 1152.

The Colorado Constitution prohibits the taking of private property for public or private use without the property owner's consent, but provides five exceptions to this prohibition, four of which pertain to constructed water facilities. Article XVI, section 7: (1) provides for access to the water source across the lands of others, embodying the common-law right-of-way rule for artificial water structures we first articulated in *Yunker v. Nichols;* and (2) requires compensation for the construction of water project features on the land of those who do not consent. Article II, section 14 further recognizes and addresses the private right of condemnation for the construction of waterworks:

> Private property shall not be taken for private use unless by consent of the owner, except for private ways of necessity, and except for reservoirs, drains, flumes, or ditches on or across the lands of others for

agricultural, mining, milling, domestic or sanitary purposes.

Colo. Const. art. II, § 14.[33] Article II, section 15 establishes a compensation requirement for such takings:

> Private property shall not be taken or damaged, for public or private use, without just compensation. Such compensation shall be ascertained by a board of commissioners, of not less than three freeholders, or by a jury, when required by the owner of the property, in such manner as may be prescribed by law, and until the same shall be paid to the owner, or into court for the owner, the property shall not be needlessly disturbed, or the proprietary rights of the owner therein divested; and whenever an attempt is made to take private property for a use alleged to be public, the question whether the contemplated use be really public shall be a judicial question, and determined as such without regard to any legislative assertion that the use is public.

Colo. Const. art II, § 15.

The Landowners assert that the General Assembly has adopted certain statutes which, in combination with the above-cited constitutional provisions, evidence legislative intent to require their consent to water storage occurring in aquifers extending through their properties. The Landowners cite three statutory provisions for this proposition. The first reads:

> Waters in underground aquifers are not in storage or stored except to the extent waters in such aquifers are placed there by other than natural means with water to which the person placing such water in the

---

**33.** We conclude that this provision's reference to condemnation for "reservoirs" on or across the lands of others refers to artificial structures constructed on or in land to hold water in storage, as each of the remaining terms in the provision is an artificial structure and reservoirs are generally understood to be flat water impoundments constructed for the purpose of damming water. *See* § 37–84–117, 10 C.R.S. (2001); § 37–87–101(1), 10 C.R.S. (2001); *Sylvester v. Jerome*, 19 Colo. 128, 135, 34 P. 760, 763 (1893) (addressing the responsibility of the appropriator for leakage and overflow from a constructed reservoir); *Denver City Irrigation & Water Co. v. Middaugh*, 12 Colo. 434, 441–43, 21 P. 565, 568–69 (1889) (addressing the landowner's recovery of damages in an eminent domain proceeding for the construction of a reservoir). The specific manmade facilities listed in Article II, section 14 are not comprehensive or preclusive of the qualification of other facilities under eminent domain proceedings. Pipelines, for example, are among the artificial structures that may qualify for a public or private taking through eminent domain. *See Town of Lyons v. City of Longmont*, 54 Colo. 112, 117, 129 P. 198, 200 (1912); *Pine Martin Mining Co. v. Empire Zinc Co.*, 90 Colo. 529, 535–37, 11 P.2d 221, 224–25 (1932).

underground aquifer has a conditional or decreed right.

§ 37–92–103(10.5), 10 C.R.S. (2001).

The second provides:

Underground aquifers are not reservoirs within the meaning of this section except to the extent such aquifers are filled by other than natural means with water to which the person filling such aquifer has a conditional or decreed right.

§ 37–87–101(2), 10 C.R.S. (2001).

The third states:

Acquisition of those interests in real property reasonably necessary for the construction, maintenance, or operation of any water storage reservoir, together with inlet, outlet, or spillway structures or other facilities necessary to make such reservoir effective to accomplish the beneficial use or uses of water stored or to be stored therein, may be secured under the laws of eminent domain.

§ 37–87–101(1), 10 C.R.S. (2001). The Landowners contend that these statutory sections, read together, require PCSR to obtain their consent or proceed through eminent domain to obtain an easement for an aquifer storage right within their properties.

In construing section 37–87–101(1) in the context of Colorado water law, the Water Court disagreed:

This provision states that the laws of eminent domain may be used to acquire such interests in real property that are *"reasonably necessary for the construction, maintenance or operation of any water storage reservoir, together with ... other facilities necessary"* to effectively store and beneficially use the water sought to be stored. In this case, no facilities of any kind will be constructed on [the Landowners'] land, nor will [PCSR's] use and operation of its underground storage activities take place on [the Landowners'] land.

(Emphasis in original.) We agree with the Water Court. The language of these provisions and the course of the legislature's enactment of them require an interpretation contrary to that which the Landowners advance.

As we have held previously in this opinion, under the provisions of sections 37–87–101(2), 37–92–103(10.5), and 37–92–305(9)(c), the holders of decreed water use rights may place water into, occupy or convey water through, and withdraw water from aquifers. However, an applicant for a conditional decree to utilize available aquifer storage space must demonstrate that it will capture, possess, and control water lawfully available to it and, without injury to other water rights, will artificially recharge that water into the aquifer, such as through a constructed injection well or structure built on the land's surface. To obtain an absolute decree for aquifer storage, the applicant must artificially recharge the water into the aquifer pursuant to a decreed water use right for storage and subsequent beneficial use. This is the meaning and the effect of the General Assembly's 1979 amendments, which added sections 37–92–103(10.5) and 37–92–305(9) to the statutes while the "Huston claims" were pending before the courts in *Southwestern*. We now turn to the legislative proceedings that produced these statutory provisions.

Sponsored by Senator Fred Anderson in 1979, Senate Bill 481 introduced the requirement that no water court conditional or absolute decree could issue for appropriation of water unless the appropriator has a plan for and then actually accomplishes the capture, possession, and control of the water for beneficial use. *See* ch. 346, sec. 6, § 37–92–305(9)(a) & (b), 1979 Colo. Sess. Laws 1366, 1368–69. Senate Bill 481 precluded a person from obtaining a decree involving aquifer storage, unless the applicant for the conditional water right planned to artificially recharge the aquifer with water it lawfully captured, possessed, and controlled. *See id.* This provision states:

No *water right* or conditional water right *for the storage of water in underground aquifers* shall be recognized or decreed *except to the extent water* in such an aquifer has been *placed there by other than natural means* by a person having a conditional or decreed right to such water.

§ 37–92–305(9)(c), 10 C.R.S. (2001) (emphasis added).

Thus, Senate Bill 481 plainly authorized conjunctive use projects involving artificial recharge and aquifer storage.[34] The General Assembly has allowed "storage" in "aquifers" and underground "reservoirs" pursuant to decreed water rights.[35] *See* ch. 346, secs. 3, 5, 1979 Colo. Sess. Laws 1366, 1367, 1368. The General Assembly's reference to underground "reservoirs" in section 37–92–103(10.5) employs the science of hydrology. The reservoir referred to in this section is not one created by a dam but, rather, is the aquifer into which artificially recharged water is placed. *See* Manning, *supra,* at 148; § 37–92–103(10.5).

In so providing, the General Assembly preserved the requirement of proceeding by eminent domain for the construction of waterworks facilities under section 37–87–101(1), including artificial recharge structures and wells, when such features are located on or in another's land without consent. *See* ch. 346, sec. 5, 1979 Colo. Sess. Laws 1366, 1368; *Roaring Fork,* 36 P.3d at 1232; *Gibbs v. Wolf Land Co.,* 856 P.2d 798, 801 (Colo.1993); *Bubb v. Christensen,* 200 Colo. 21, 26–27, 610 P.2d 1343, 1346–47 (1980); *accord FWS Land & Cattle Co. v. State,* 795 P.2d 837, 839–41 (Colo.1990) (stating that, under section 37–92–305(9)(b), an applicant proposing to increase the effective storage capacity of an existing surface reservoir constructed on state lands must have the state's consent in order for the application to satisfy the "can and will" test).

Article XVI, section 7, Article II, sections 14 and 15, and section 37–87–101(1) establish a private right of condemnation of private property through eminent domain for "those interests in real property reasonably necessary for the construction, maintenance, or operation of any water storage projects." Section 37–87–101(1) provides in full:

> The right to store water of a natural stream for later application to beneficial use is recognized as a right of appropriation in order of priority under the Colorado constitution. No water storage facility may be operated in such a manner as to cause material injury to the senior appropriative rights of others. Acquisition of those interests in real property reasonably necessary for the construction, maintenance, or operation of any water storage reservoir, together with inlet, outlet, or spillway structures or other facilities necessary to make such reservoir effective to accomplish the beneficial use or uses of water stored or to be stored therein, may be secured under the laws of eminent domain.

§ 37–87–101(1), 10 C.R.S. (2001).

The first two sentences of this subsection clearly provide that storage for subsequent use of natural stream waters is a constitutionally protected appropriative right, the exercise of which must not cause material injury to decreed senior appropriative rights. The third sentence plainly pertains to facilities that the holder of a water use right constructs to divert, store, or convey water in the exercise of decreed rights. *See Roaring Fork,* 36 P.3d at 1232.

In the case before us, the proposed project facilities include constructed wells, dams, recharge reservoirs, and other water works, but the project does not include the location of any artificial features on or in the Landowners' properties. Thus, PCSR would not need the consent of the Landowners or an easement, nor would it have to pay just compensation to them, and no trespass occurs simply as the result of water moving

---

**34.** In this way, the General Assembly addressed claims for underground storage, such as the "Bluepond" claims we remanded to the Water Court for review in *Southwestern,* 671 P.2d at 1320–21. Those claims asserted water storage rights in natural underground formations formed by glacial terminal moraines. The General Assembly countered with the requirement of artificial recharge in order to obtain a conditional decree for an underground storage right.

**35.** As we pointed out earlier in this opinion, hydrologists and commentators often refer to underground aquifers, even in their natural condition, as "reservoirs" or "stored waters." *See, e.g.,* Corker, *supra,* at 68–75. Stream/aquifer interactions are governed by a set of complex processes. Pumping, recharge and storage activities change the water table conditions. *See generally* Robert Glennon, *The Concept of Capture: The Hydrology and Law of Stream/Aquifer Interactions,* 43 Rocky Mtn. Min. L. Inst. 22–1 to 22–14 (1997).

into an aquifer and being contained or migrating in the course of the aquifer's functioning underneath the lands of another.

This construction of the Colorado Constitution and statutes implements Colorado's policy that water is a public resource available for public agency and private use in a system of maximum utilization for beneficial use under decreed rights. *See Empire Lodge*, 39 P.3d at 1147; *Chatfield E. Well Co.*, 956 P.2d at 1267. The 1969 Act states a policy "to integrate the appropriation, use, and administration of underground water tributary to a stream with the use of surface water in such a way as to maximize the beneficial use of all of the waters of this state." § 37–92–102(1)(a).

Allowing property owners to control who may store water in natural formations, or charging water right use holders for easements to occupy the natural water bearing surface or underground formations with their appropriated water, would revert to common-law ownership principles that are antithetical to Colorado water law and the public's interest in a secure, reliable, and flexible water supply made available through the exercise of decreed water use rights. It would disharmonize Colorado's historical balance between water use rights and land ownership rights. It would inflate and protract litigation by adding condemnation actions to procedures for obtaining water use decrees. It would counter the state's goals of optimum use, efficient water management, and priority administration. *See Santa Fe Trail Ranches Prop. Owners Ass'n v. Simpson*, 990 P.2d 46, 54 (Colo.1999).

We agree with the Water Court's holding that artificially recharging an aquifer "is analogous to the use of an unconfined aquifer or natural stream for transport." This comports with longstanding principles of Colorado water law that have allowed passage of the appropriator's water across the lands of another. Section 37–87–102(4), 10 C.R.S. (2001) provides, for example:

> The owners of any reservoir may conduct the waters legally stored therein *into and along any of the natural streams of the state* but not so as to raise the waters thereof above the ordinary high water-mark, and may take the same out again at any point desired if no material injury results to the prior or subsequent rights of others to other waters in said natural streams.

§ 37–87–102(4), 10 C.R.S. (2001); *see Bd. of County Comm'rs v. Upper Gunnison River Water Conservancy Dist.*, 838 P.2d 840, 849, 854 (Colo.1992) (recognizing the right of the appropriator of storage water to conduct appropriated water and have it administered downstream through the natural channel for fishing and recreational activities along the Taylor and Gunnison Rivers).

Artificial recharge in the course of implementing either an augmentation or storage plan utilizing an aquifer is practically indistinguishable from the conveyance of appropriated water in the natural surface channel across the property of others.[36] Only the rate of the water's movement differs significantly; water in the ground generally migrates much more slowly. Conjunctive use projects are authorized by the 1969 Act, and they depend upon the ability of water right use holders to utilize the available capacity of natural surface and subsurface water bearing formations.[37]

The General Assembly intended the 1969 Act's provision for augmentation plans to allow out-of-priority diversions to facilitate new water uses in overappropriated stream systems. *See Empire Lodge*, 39 P.3d at

---

**36.** We are not presented here with a cause of action in tort for interference with surface uses due to recharge that raises the groundwater table or with any claim to interference with the use and enjoyment of the Landowners' surface or subsurface estates. *See* Thorson, *supra*, at 628–29. Our opinion should not be read as altering the otherwise applicable law regarding injury caused by alteration of natural surface drainage patterns. *See Burt v. Beautiful Savior Lutheran Church*, 809 P.2d 1064, 1067 (Colo.App.1990);

*Docheff v. City of Broomfield*, 623 P.2d 69, 71 (Colo.App.1980).

**37.** Conjunctive use projects involve ground and surface water and optimize water use. *See Alamosa–La Jara Water Users Protection Ass'n v. Gould*, 674 P.2d 914, 935 (Colo.1984); *see also* Denver Basin Artificial Recharge Extraction Rules, 2 CCR 402–11 (an example of the administration of conjunctive use projects).

1155. Augmentation plans include filling subsurface porous spaces with water by injection or artificial water spreading structures, such as unlined ditches and recharge ponds that utilize water appropriated for that purpose, and then re-extracting the stored water or taking credit for the appropriated water's return to the natural river system through underground formations extending through the lands of others.[38]

The Landowners assert that their property rights claims do not affect recharge or augmentation plans, only water storage utilizing the aquifer extending through their properties. This distinction ignores both nature's course and the law's course in Colorado. Artificial recharge, augmentation, storage and the occupancy of porous spaces by water in aquifers are intertwined. We agree with the Water Court that the common-law rule that the Landowners advocate would contravene longstanding Colorado law, "inject[ing] nearly unfathomable factual issues" into the exercise of water use rights.[39]

### III.

The Water Court did not err in concluding that PCSR's recharge, augmentation, and storage activities in aquifers pursuant to a decreed water use right would not constitute a trespass or require condemnation and the payment of just compensation, unless project features are constructed on or in the Landowners' properties. Accordingly, we affirm the Water Court's judgment.

Justice KOURLIS specially concurs in part and dissents in part, and Justice COATS joins in the special concurrence and dissent.

Justice KOURLIS specially concurring in part and dissenting in part:

Preliminarily, I would find this case to be moot because the trial court denied Applicant, Park County Sportsmen's Ranch (PCSR), its conditional water rights and found the storage plan we here address to be

infeasible. As a result, we are now answering a legal question without any facts to which to moor our decision. In a context such as this where the question is important and far-reaching and where the law is unclear, I suggest that such a venture is perilous. Accordingly, I dissent from the majority's conclusion that this case is not moot, and I would await a case in which the facts are fully developed.

If I were to reach the substantive issue, I would affirm the water court's summary judgment entered on behalf of PCSR; however, on much narrower grounds than the majority. I therefore specially concur in the balance of the majority opinion.

### I.

First, it is clear that even when parties seek declaratory relief, there must be an actual controversy. "[J]urisdiction exists only if the controversy contains a currently justiciable issue or an existing legal controversy...." *Constitution Assocs. v. N.H. Ins. Co.*, 930 P.2d 556, 561 (Colo.1996) (citing *Heron v. City & County of Denver*, 159 Colo. 314, 316, 411 P.2d 314, 315 (1966)). Here, there exists no current legal controversy, because the trial court dismissed PCSR's Application for water rights.

Declaratory judgment proceedings are not intended to address speculative inquiries, or uncertain or hypothetical questions. *Heron*, 159 Colo. at 316–17, 411 P.2d at 315. In fact, if a judicial opinion in a declaratory judgment case "will have no practical legal effect upon an existing controversy, ... [then] there is no justiciable controversy alleged as between the plaintiffs and the defendants." *Crowe v. Wheeler*, 165 Colo. 289, 295, 439 P.2d 50, 53 (1968) (holding action to enjoin election and for declaration of rights concerning eligibility of voters moot after election was concluded).

An applicant for a conditional water right must sometimes present evidence that it can

---

38. *See, e.g.*, James W. Warner, Jon Altenhofen, Jack Odor, & Brandon Welch, *Recharge as Augmentation in the South Platte River Basin*, Department of Civil Engineering, Groundwater Program Technical Report No. 21, Colorado State University (March 1994).

39. Our opinion today does not address a circumstance in which the Landowners have alleged interference with the use, benefit, and enjoyment of their properties. *See Chance*, 670 N.E.2d at 992.

and will acquire certain property rights necessary to its application, and the water court or the district court must determine the availability of such rights as a condition precedent to the application. *See Gibbs v. Wolf Land Co.*, 856 P.2d 798, 802 (Colo.1993); *FWS Land & Cattle Co. v. State Div. of Wildlife*, 795 P.2d 837, 840–41 (Colo.1990). However, the presumption is that the applicant has satisfied the other requisites for issuance of the decree.

Here, the circumstances are different. PCSR applied for conditional water rights under a plan that, if approved, would have permitted PCSR to store water below the Landowners' property. The water court denied the application. Thus, PCSR has no water to store in the aquifer, and the factual basis for this legal controversy is nonexistent. Unless or until PCSR obtains a conditional water right, which is hypothetical at this point, the majority's ruling here will not affect the rights of either party. The question is moot. *Farmers Ins. Exch. v. Dist. Court*, 862 P.2d 944, 947 (Colo.1993) (" 'Declaratory judgment proceedings may not be invoked to resolve a question which is nonexistent, even though it can be assumed that at some future time such question may arise.' ") (quoting *Taylor v. Tinsley*, 138 Colo. 182, 183–84, 330 P.2d 954, 955 (1958)).

I differ with the majority's suggestion that the issue is generic and should be resolved in a vacuum. PCSR's application contains a confusing and all-inclusive request for storage rights. In considering the application, the water court stated, "The Applicant proposes to create storage by withdrawing 140,000 acre-feet from the South Park Formation.... The resulting cone of depletion will constitute the 'storage vessel.'" In the application itself, PCSR states that it seeks storage in the saturated and unsaturated portions of the aquifer formation and that it seeks storage in two aquifer zones. In short, the application is all-inclusive and confusing.

In the water case, the water court concluded that the plan was a proposal only to replace that amount of water PCSR removed from the cone of depletion, not a plan to fill space that was originally empty. On that basis, the water court found: (1) that the recharge model was not sufficiently reliable to permit a reasonably accurate determination of either the timing, amount, and location of stream depletion, or the timing and amount of aquifer recharge; (2) that the surface flow model was insufficiently reliable to determine stream flow or legal availability of water and that it overestimated the stream flows available to PCSR; and (3) that the proposal was no more than "a scheme to augment out-of-priority depletions with additional out-of-priority pumping and exacerbated depletions to the aquifer and the river system." Based on those findings, it concluded that PCSR did not meet the statutory requirements for approval of an augmentation plan and that PCSR was gambling on sufficient rainfall to replace the water deficit created by its pumping.

Therefore, I disagree with the majority's contention that this is an important "predicate to proceeding to the merits of PCSR's conditional decree application." *See* maj. op. at 699. There are no property rights that the water court identified as being a predicate to, or having any bearing upon, consideration of the application. Rather, the water court determined that the PCSR's plan would not work. As a result, the water court declined to grant PCSR any water rights. Therefore, the factual basis for this legal controversy is nonexistent.

Because I view it as inadvisable to address a question of this magnitude without real interests at stake and without full factual development and because "[c]ourts must confine their exercise of jurisdiction to cases that present a live case or controversy," *Davidson v. Comm. for Gail Schoettler, Inc.*, 24 P.3d 621, 623 (Colo.2001), I would find the issues in this case to be moot and would decline to reach them.

## II.

Were I to resolve the substantive issues, I would do so on a very limited basis. The Landowners in this declaratory judgment action sought a declaration that PCSR has no right to occupy the space beneath their lands to store water, and that any placement or storage of water on or below the surface of

their property constitutes a trespass. The undisputed facts of the case indicate that Landowners made no showing or attempted showing that the placement of waters in the space beneath their land would in any way compromise or invade the use, enjoyment, or benefit attendant upon their ownership rights. Landowners further presented no evidence disputing PCSR's contention that the storage would occur within the natural aquifer. In my view, therefore, the Landowners in this particular declaratory judgment action have failed to set forth facts that would entitle them to a resolution in their favor.

However, I disagree with the majority that the only circumstance in which the Landowners would have the right to pursue declaratory relief would be the circumstance wherein PCSR would propose to construct project facilities on the Landowner's properties. I suggest that there would be a material issue of disputed fact that would defeat summary judgment if the Landowners presented some evidence that PCSR's plan would injure or invade their property interests, or if the Landowners presented evidence that the proposed storage was to occur other than within the natural aquifer.

### III.

The law that deals with ground water represents an uneasy melding of water law related to surface uses, as modified by statutory provisions that govern ground water uses. Certainly, in the context of surface waters, augmentation and storage are different. Storage places water in a facility for later use under section 37–87–101(1), 10 C.R.S. (2001), whereas augmentation is the act of placing water in a stream system (surface or ground) to replace out-of-priority diversions. *See* § 37–92–103(9), 10 C.R.S. (2001). Recharge, on the other hand, is the physical act of putting water into an aquifer, and can apply either to augmentation or storage. When such injected water is used to replace out-of-priority depletions, it comprises augmentation water. *In re Plan for Augmentation of City & County of Denver v. City &*

*County of Denver,* 44 P.3d 1019, at 1025, (Colo. 2002). When it is impounded and "reserved" entirely to the party that places it in storage, it is stored water. § 37–87–101(1).

Storage of water in a moving underground system, such that the stored water can be withdrawn out of priority, is a novel concept. Clearly, it has no analogue in the development of the law concerning surface water. Historically, storage has meant: "impoundment, possession, and control of water by means of a dam." § 37–92–103(10.5), 10 C.R.S. (2001). Storage rights have also historically involved property interests in land associated with that structure. § 37–87–101(1).

Here, PCSR asserts that the underground formation it seeks to use for storage purposes

creates a water storage system capable of operation by Applicant as an underground reservoir. The unsaturated portion of the South Park Formation itself contains storage capacity which Applicant will utilize. The South Park Aquifer is contained within the saturated portions of the South Park Formation and can also be utilized as a reservoir....

... Applicant claims the right to utilize both the saturated as well as the unsaturated portions of the South Park Formation for water storage.

PCSR claims the right to utilize water storage space in the "South Park Formation Underground Reservoir System which will be filled and refilled ... both to such reservoir system's existing storage capacity as well as to new capacities." PCSR also claims the right "to fully consume by recapture and otherwise all waters diverted into Applicant's South Park Formation Underground Reservoir System." PCSR claims 140,000 acre feet of water, all conditional, with 70,000 acre feet of volumetric storage separated into two reservoir zones; PCSR then states that the total maximum capacities of the two reservoirs equal a combined 140,000 acre-feet.[1]

---

1. I note that these specifics come from the rec-

ord relating to the application for a conditional

The result is that PCSR seeks to use an entire basin, tributary in nature, as a repository for water that it will then withdraw out-of-priority. The question before us relates to the overlying Landowners' rights to object to that plan.

### A.

To begin with the easiest precept, it is quite clear that a landowner does not own the waters traversing his property. *In re Plan for Augmentation of City & County of Denver*, 44 P.3d at 1024 – 1025, *Chatfield E. Well Co. v. Chatfield E. Prop. Owners Ass'n*, 956 P.2d 1260, 1268 (Colo.1998) (noting that no person owns Colorado's public water resource as a result of land ownership). Others have the right to use such water in accordance with the priority system. *Empire Lodge Homeowners' Ass'n v. Moyer*, 39 P.3d 1139, 1147 (Colo.2001).

It is equally clear that such use can sometimes involve the artificial augmentation of the stream with waters from another drainage. § 37–92–103(9), 10 C.R.S. (2001). Similarly, a ground water recharge plan makes use of the ground water system for transportation and augmentation. The landowner does not own the ground waters underlying his property, just as he does not own the surface waters traversing his property. *Chatfield E. Well Co.*, 956 P.2d at 1268.

### B.

However, here the clear parallels with surface water law begin to deteriorate. As to surface usage, it has also been a matter of undisputed law that one water user may not construct a storage facility on the land of another without permission or payment of just compensation. Colo. Const. art. II, § 14; § 37–87–101(1), 10 C.R.S. (2001); *Mortensen v. Mortensen*, 135 Colo. 167, 168–69, 309 P.2d 197, 198 (1957). It is equally irrefutable that one water user may not make use of a naturally existing water storage facility on the land of another without permission or payment of just compensation. § 37–87–101(2), 10 C.R.S. (2001); *Mortensen*, 135 Colo. at 168–69, 309 P.2d at 198; *see also FWS Land & Cattle Co.*, 795 P.2d at 840–41 (finding that granting the plaintiff's motion for summary judgment was proper where the defendant did not have complete ownership of the reservoir bed nor permission to use the state lands for expanded storage purposes; because a right to use lands underlying a reservoir involves real property issues, the water court's refusal to adjudicate relative ownership interests was correct).

### C.

We now arrive at the storage of water in underground aquifers. The legislature has the authority to control the use of ground water in Colorado. *Upper Black Squirrel Creek Ground Water Mgmt. Dist. v. Goss*, 993 P.2d 1177, 1182 (Colo.2000); *State v. Southwestern Water Conservation Dist.*, 671 P.2d 1294, 1316 (Colo.1983). It is to the statutes, therefore, that we must look to determine the extent and parameters of any underground storage rights. The Colorado General Assembly has addressed storage in underground aquifers in only two statutory provisions. Section 37–92–305(9)(c) declares that: "No water right or conditional water right for the storage of water in underground aquifers shall be recognized or decreed except to the extent water in such an aquifer has been placed there by other than natural means by a person having a conditional or decreed right to such water." Section 37–87–101(2) provides that: "Underground aquifers are not reservoirs within the meaning of this section except to the extent such aquifers are filled by other than natural means with water to which the person filling such aquifer has a conditional or decreed right." [2]

decree, which the water court denied and which is now on appeal.

**2.** I note that the "section" to which 37–87–101(2) refers includes the general language of 37–87–101(1) that outlines the general legal principles governing operation and acquisition of a storage facility. For example, 37–87–101(1) requires that an individual or entity proposing to store water of a natural stream for later application to beneficial use must acquire such interests in real property as are reasonably necessary for the construction, maintenance, or operation of the storage facility.

It is only these two statutes[3] upon which we rely in concluding that the General Assembly has authorized the issuance of decrees for underground storage of out-of-priority water, without the constraints that would apply to a similar surface water project. Specifically, we are concluding that the impoundment requirement of the storage statute is satisfied if the applicant captures water and artificially injects it into the aquifer—with no requirement that the applicant demonstrate any subsurface impoundment of the water. Similarly, we are concluding that there are no "real property interests" associated with using an aquifer as a storage facility.

Although I agree with the basic premise that conjunctive use is anticipated and that underground storage of water is legislatively permitted, without any blanket need for overlying landowner approval, I read the statutes to pose as many questions as they answer.

For example, I am unclear as to how the General Assembly suggests that storage capacity of an aquifer be determined. Section 37–87–102(4), 10 C.R.S. (2001), specifically prohibits raising the waters of a natural stream used for transportation above the ordinary high water mark. In this case, PCSR in its application for water rights specifically states that it intends to use both the saturated and the unsaturated portions of the underground formation. Because of the statutory prohibition against raising the water levels of a stream above its natural high watermark, I question whether the use of unsaturated portions of the formation would do just that. I would permit landowners to raise that issue in a declaratory judgment context, and to obtain relief upon a showing of some injury or invasion of use or enjoyment rights. I would also permit a mineral owner to make a similar showing and seek similar relief if the use of underground formations would intrude upon or damage mineral use, preservation, or extraction. Similarly, the Landowners might be entitled to relief if PCSR were to propose a use that might damage some portion of the Landowners' property rights, an activity potentially prohibited by section 37–87–102(4), the statute that authorizes transportation of water across privately owned land. Although the legislature has allowed the transportation of water across privately owned streambeds, it has not authorized the flooding or damaging of dry portions of a landowner's property without payment of just compensation; in fact, it has expressly prohibited it. § 37–87–101.

Furthermore, although I agree that the Landowners here made an insufficient showing to defeat summary judgment, I do not dismiss their claims of ownership in the absolutist manner in which the majority does. I could envision a circumstance in which there would be a segregated underground storage cavern, unrelated to the aquifer and self-contained—as to which overlying landowners would retain ownership interests. It is clear in the law that landowners retain the right to the physical ownership of their properties, absent reservations, easements, or other reductions in the "bundle of sticks." The legislature has specified that "land" should be defined broadly to include a coextensive meaning with "the terms 'land,' 'tenements,' and 'hereditaments' and as embracing all mining claims and other claims, and chattels real." § 38–30–150, 10 C.R.S. (2001). For as long as Colorado has been a state, this court has recognized that "[l]and has an indefinite extent upward and downward from the surface of earth, and therefore includes whatever may be erected upon it, and whatever may lie in a direct line between the surface and the center of the earth." *Walpole v. State Bd. of Land Comm'rs*, 62 Colo. 554, 557, 163 P. 848, 849–50 (1917) ("Land is the soil of the earth, and includes everything ... buried beneath it.... A grant of lands therefore, without any qualification, conveys not only the soil, but everything which is attached to it, or which constitutes a part of it, the buildings, mines, trees, growing crops, etc.") (internal quotation marks omitted); *Bogart*

---

**3.** The majority also cites one additional statute that refers to "underground water storage": this statute grants the State Soil Conservation Board the authority to study underground water storage projects. § 35–70–103(6)(a), 10 C.R.S. (2001). The other two statutes to which the majority refers relate only to increasing underground reserves and do not mention storage.

*v. Amanda Consol. Gold Mining Co.*, 32 Colo. 32, 35–36, 74 P. 882, 883 (1903) (observing that under common law, ownership of the property surface carries with it the ownership of everything beneath and above it; this prima facie ownership continues until rebutted by a showing of severance); *Wolfley v. Lebanon Mining Co.*, 4 Colo. 112, 114 (1878) (except as otherwise modified by statute, the common law mandates that "a grant of land carries with it all that lies beneath the surface down to the center of the earth. At his pleasure the owner of the soil may apply to his own purposes whatever is included in the segment of the earth carved out by his descending exterior boundary lines.... [D]ownward whatever is in a direct line, between the surface of any land and the center of the earth, belongs to the owner of the surface ...."); *see, e.g.,* 2 Herbert Thorndike Tiffany, *Real Property* § 585 (3d ed. 1939 & Supp.2001) ("The owner of the surface of land is prima facie the owner of the soil or mineral deposits to the center of the earth, and any underground encroachment by an adjoining owner is trespass or nuisance."); 3 *American Law of Mining* § 86.01[2][a] (Rocky Mountain Mineral Law Foundation 2d ed., 2001) (noting that, prior to severance, the surface owner is vested with ownership of the surface and the subsurface).

Additionally, citing the common-law rule, this court has held that it is the general rule of property law in Colorado that "the land underlying non-navigable streams is the subject of private ownership and is vested in the proprietors of the adjoining lands." *People v. Emmert*, 198 Colo. 137, 140, 597 P.2d 1025, 1027 (1979). Thus, although the public owns the water flowing across the land, the landowner has exclusive ownership of the streambed itself. *Id.*

Courts around the nation have also held that the owner of a mineral estate (or where the estates are unsevered, the owner of the surface estate) also owns the empty space created by the removal of the minerals and any use of that space constitutes trespass. 6 *American Law of Mining, supra,* § 203.01[3]; Comment, *Interests Created by*

*Grants of Coal Apart from the Surface,* 31 Yale L.J. 747 (1921–22).

Some courts, in early jurisprudence, addressed ownership based on theories of adverse possession and location of entrance and exit. Those courts reached the conclusion that, where severance has not occurred, the portion of the subterranean cavern underneath a surface owner's land belongs entirely to the surface owner. *E.g., Marengo Cave Co. v. Ross*, 212 Ind. 624, 10 N.E.2d 917, 922–23 (1937) (holding that when dealing with an underground cavity, absent severance of the mineral estate, a landowner's title extends from the surface of the earth downward to all land and caverns underlying the surface); *Edwards v. Sims*, 232 Ky. 791, 24 S.W.2d 619, 620 (1929) ("[T]he owner of realty, unless there has been a division of the estate, is entitled to the free and unfettered control of his own land above, upon and beneath the surface. So, whatever is in a direct line between the surface of the land and the center of the earth belongs to the owner of the surface."); *City of Kingston v. Knaust*, 287 A.D.2d 57, 733 N.Y.S.2d 771, 773 (N.Y.App.Div.2001) (reconfirming the long-established principle that a conveyance of real property encompasses all subterranean rights including ownership of mines, caves, and caverns).

Hence, although a landowner does not own a moving creek or river—be it on the surface or underground, the landowner may own subterranean caverns and caves under his land. I could envision circumstances in which overlying landowners might well have the right to demand compensation for the use of underground facilities used for storage of water and would not preclude consideration of such a case by operation of today's judgment.

## IV.

In summary, I would first decline to address this case on mootness grounds. Were I to reach the substantive issues, I would affirm the trial court on a very narrow factual premise. On the other hand, I would not prevent other landowners from asserting similar claims in circumstances in which they could demonstrate injury, invasion of use, or

even in which they could demonstrate that the applicant intended to use a natural, self-contained cavern that was not part of an underground aquifer for storage purposes. I advocate a cautious, case-by-case approach to this area of the law because of the importance of these issues and because of the incomplete and sometimes contradictory expression of legislative intent.

Thus, I respectfully dissent in part and specially concur in part.

I am authorized to state that Justice COATS joins in this special concurrence and dissent.